# EXHIBIT "A"

IN THE CIRCUIT COURT OF TENNESSEE
FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

F I L E D

APR 0 3 2009

CIRCUIT COURT CLERK
BY_____ D C

CORNERSTONE SYSTEMS, INC.,       )
                                 )
          Plaintiff,             )
                                 )
v.                               )     No. CT-001644-09   Div. 1
                                 )
CENTURY SURETY COMPANY,          )
                                 )
          Defendant.             )

---

## COMPLAINT

---

Plaintiff Cornerstone Systems, Inc. ("Cornerstone" or "Plaintiff") submits the following

Complaint against Defendant Century Surety Company ("Century" or "Defendant") and states as

follows:

### PARTIES, JURISDICTION, AND VENUE

1.      Cornerstone is a Tennessee corporation conducting business primarily as a

property freight broker under authority of the Federal Motor Carrier Safety Administration, MC

#321007.

2.      Century, on information and belief, is an Ohio corporation conducting business in

Tennessee.

3.      Jurisdiction and venue in this Court are proper pursuant to Tenn. Code Ann. §§

16-10-101 and 20-2-201, et seq.  Further, Plaintiffs aver that this cause of action was filed within

one year of the acts of violation of the Tennessee Consumer Protection Act and, therefore,

jurisdiction and venue in this Court is proper pursuant to Tenn. Code Ann. § 47-18-109(a).

## FACTUAL BACKGROUND

4.      As part of its business operations, Plaintiff desired to purchase contingent cargo liability insurance to cover the risk of loss (including theft) to its shipper customers in the event the motor carrier insurance of the delivering carrier did not cover the loss for any reason.

5.      Plaintiff contacted USI of Tennessee, Inc. ("USI") and George M. Moreland, III ("Moreland"), Defendant Century's insurance agents, to inquire and obtain contingent cargo liability insurance.

6.      On or about July 1, 2007, Plaintiff purchased contingent cargo insurance from Defendant Century ("Policy"). (See **Exhibit A** attached hereto).

7.      On or about April 16, 2008, a shipment of tequila, which Plaintiff had brokered to a motor carrier, Dolle Services, was partially stolen ("loss").

8.      On or about July 16, 2008, Plaintiff filed a claim for the loss in accordance with the Policy's requirements.  (See **Exhibit B** attached hereto).

9.      On information and belief, Century hired W.K. Webster Overseas Limited who then hired MRC Investigations ("MRC") to investigate the loss.  The investigative report issued by MRC is dated September 4, 2008.  (See **Exhibit C** attached hereto).

10.      On or about April 30, 2008, Connecticut Distributors, owner of the freight, submitted a Loss and Damage Claim against Plaintiff.  Plaintiff paid the claim in the amount of One Hundred Thousand Four Hundred Seventy-eight and 00/100 Dollars ($100,478.00) (See **Exhibits D and E**), and obtained an assignment of Connecticut Distributors' rights. (See **Exhibit F**).

11.      On or about February 10, 2009, after numerous requests for a copy of the MRC report, Defendant Century furnished a copy of it to Plaintiff.

12.      The MRC investigation indicates that the nature of the loss was theft.

13.     On or about November 7, 2008, Defendant Century denied Plaintiff's claim (which was submitted on July 16, 2008), asserting numerous exclusions under the policy. (See **Exhibit G**).

14.     In February 2009, USI and Moreland, on behalf of Plaintiff, made written demand on Defendant Century for payment of the claim. (See **Exhibit H**).

15.     On or about February 25, 2009, Defendant Century sent a letter to USI denying the claim. (See **Exhibit I**).

16.     On or about March 3, 2009, Plaintiff's attorney, Ronald H. Usem, sent a demand letter to Defendant Century. (See **Exhibit J**).

17.     On or about March 18, 2009, Defendant Century sent a letter / email to attorney Usem indicating that the timing of a response may not be made in time to meet the one-year limitation for action which is provided for in the policy. (See **Exhibit K**).

COUNT ONE

BREACH OF CONTRACT

18.     Cornerstone adopts and incorporates by reference the allegations set forth in paragraphs 1–17.

19.     Plaintiff entered into a contractual agreement with Defendant Century, the Policy, which purportedly covered losses sustained as a result of theft.

20.     The MRC investigation indicates that the nature of the loss was theft.

21.     Notwithstanding numerous demands for payment, Defendant Century has denied coverage/payment.

22.     As a result of Defendant Century's breach of contract, Plaintiff has sustained damages of One Hundred Thousand Four Hundred Seventy-eight and 00/100 Dollars ($100,478.00), plus interest.

## COUNT TWO

### VIOLATION OF TENNESSEE'S CONSUMER PROTECTION ACT

23.     Cornerstone adopts and incorporates by reference the allegations set forth in paragraphs 1–22.

24.     This claim is for violation of the Tennessee Consumer Protection Act of 1977 as stated in Tennessee Code Annotated §§ 47-18-101, et seq. (hereinafter referred to as the "Act") by Defendant.

25.     As a result of the above, inter alia, the Defendant committed one or more unfair or deceptive acts/practices in violation of the Act, including, but not limited to:

A.     Creating the false impression that in purchasing the Policy, Plaintiff would have the confidence knowing that its shipments were fully covered in the event of a loss sustained as a result of theft;

B.     Affirmatively representing to Plaintiff that certain exclusions to the Policy warranted denial of Plaintiff's claim, knowing that such exclusions are inapplicable to the loss at issue in this case; and

C.     Unfairly refusing to pay Plaintiff's claim under the Policy even though Plaintiff filed a claim for the loss in accordance with the Policy's requirements and the MRC investigation revealed that the nature of the loss was theft, an occurrence covered by the Policy.

26.     Defendant's refusal to pay Plaintiff's claim constitutes an "unfair or deceptive act or practice" under the Act.

27.     As a direct result of Defendant's unfair refusal to pay Plaintiff's claim, Defendant has violated the Act, and Plaintiff has sustained damages of One Hundred Thousand Four Hundred Seventy-eight and 00/100 Dollars ($100,478.00), plus interest.  Plaintiff is entitled to recover these damages as well as its reasonable attorney fees and treble damages.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** Cornerstone requests the following relief:

1.      That process be issued and that Defendant be made to appear and answer;

2.      That the Court award Plaintiff compensatory damages in the amount of at least $100,478.00, plus interest, for damages incurred through the filing of this Complaint;

3.      That the Court award Plaintiff treble damages pursuant to Tenn. Code Ann. § 47-18-101, et seq.;

4.      That the Court award Plaintiff its reasonable expenses, including attorneys' fees and court costs, in bringing this action; and

5.      That the Court provide such other, further, and additional relief as the Court may deem just.

Respectfully submitted,

ADAMS AND REESE LLP

By: _____

MARK S. NORRIS          (7354)
TRICIA T. OLSON          (24643)
Brinkley Plaza
80 Monroe Avenue, Suite 700
Memphis, Tennessee 38103-2467
Tel: (901) 525-3234
Fax: (901) 524-5419

*Attorneys for Plaintiff*



# Century Surety Company

**USI**

USI of Tennessee, Inc.
5100 Poplar Avenue, Suite 1200
Memphis, TN 38137

465 Cleveland Avenue
Westerville, Ohio 43082
614-885-2000
www.centurysurety.com
**COMMERCIAL LINES POLICY
COMMON POLICY DECLARATIONS**

*This insurance contract is with an insurer not licensed to transact insurance in this state and is issued and delivered as a surplus line coverage pursuant to the Tennessee insurance statutes.*

POLICY NO.:  CCP469452

CODE NO:  5952A

NAMED INSURED AND ADDRESS:
Cornerstone Systems Inc.
5101 Wheelis Dr., Suite 300
Memphis Tennessee  38117

INSUREDS AGENT:
Vista Insurance Partners of IL Inc.
6 West Hubbard Street, 4th Floor
Chicago Illinois  60610

POLICY PERIOD:  From:  07/01/2007  To:  07/01/2008  at 12:01 A.M. Standard time at your mailing address shown above.
Business Description:
Individual    Joint Venture    Partnership    Limited Liability Company (LLC)    XX   Organization (Other than Partnership, LLC or Joint Venture)

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY:**

**THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.  THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.**

| | **PREMIUM** |
|---|---|
| Ocean Cargo | $   83,500.00 |

| 100% of the Policy Premium is fully earned as of the effective date of this policy and is not subject to return or refund. | TOTAL | $   83,500.00 |
|---|---|---|

Service of Suit (if form CCP 20 10 is attached) may be made upon:  **2.5% Tennessee Tax: $2,087.50**

Form(s) and Endorsement(s) made a part of this policy at time of issue*:  SEA1000 0506; SEA1200 0606; SEA1002 0606; SEA1073A 0606; SEA1143 0606; SEA1044 0606; SEA1052 0606; SEA1017 0606; SEA1017A 0606; SEA1063 0606; CCP2010 0900

*Omits applicable Forms and Endorsements if shown in specific Coverage Part/Coverage Form Declarations.
Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing false or deceptive statement is guilty of insurance fraud.
COMPANY REPRESENTATIVE:

Countersigned By  _____
Authorized Representative

IN WITNESS WHEREOF, this Company has executed and attested these presents; but this policy shall not be valid unless countersigned by the duly Authorized Agent of this Company at the Agency hereinbefore mentioned.

Secretary                         President

CSCP 10 01 03 06

EXHIBIT
A

## COMMERCIAL OCEAN MARINE DECLARATIONS
## OCEAN CARGO

**NAMED ASSURED AND MAILING ADDRESS:**     **POLICY NUMBER: CCP469452**

Cornerstone Systems Inc.                          **EFFECTIVE DATE: 07/01/2007**
5101 Wheelis Dr., Suite 300
Memphis Tennessee 38117

---

**INTEREST INSURED:** General Commodities

---

**LIMITS OF LIABILITY:**

| | |
|---|---|
| $N/A | per any one steamer or motor vessel or connecting conveyance or in any one place at any one time. |
| $N/A | shall apply to shipments "On-deck" per any one steamer or motor vessel and shipped subject to an "On-Deck" bill of lading. |
| $N/A | per any one barge, except as a connecting conveyance. |
| $N/A | per any one air conveyance. |
| $N/A | per any one rail or truck operating outside the continental United States (except as a connecting conveyance). |
| $N/A | per package shipped by mail, parcel post and or registered mail. |
| $1,000,000.00 | per Occurrence. |
| $1,000,000.00 | Domestic Intermediary except |
| $ 250,000.00 | Domestic Intermediary - Mexico |
| $EXCLUDED | War Endorsement. |
| $See Attached | Warehouseman's Legal Liability Endorsement |

Ocean Marine Declarations – Continued

**DEDUCTIBLE:**

| | |
|---|---|
| Foreign Transit: | $N/A Deductible Per Occurrence |
| Domestic Intermediary: | $5,000 Deductible Per Occurrence except $50,000 on shipments of consumer electronics<br>$10,000 Deductible – Freezing of Alcoholic Beverages |
| Warehouseman's Legal Liability | $See Attached |

**DEPOSIT PREMIUM:**    $83,500.00

**TOTAL MINIMUM PREMIUM:**  $83,500.00

**REPORTING /ADJUSTMENT:**  Quarterly reporting and adjustment

04/10/2009 11:07 AM 96673_50647

# OCEAN CARGO POLICY

## NOTICE TO THE ASSURED

In accordance with the terms and conditions of this Policy, you must contact the nearest Settling Agent for Overseas Claim handling as designated below (within the continental US, please contact your Broker or fax or email your claim information as outlined below in "NOTICE TO AGENTS"):

- **AGENTS IN EUROPE/AFRICA/NEAR AND MIDDLE EAST**
  Settling Agent: W.K. Webster & Co.          Phone:  208 300 7744
  Walsingham House – Seething Lane             Fax:     208 309 1266
  London  EC3N 4DL                            Email:   info@wkw.co.uk

- **AGENTS IN FAR EAST/SOUTH PACIFIC**
  Settling Agent: W.K. Webster (International) Pte. Ltd.   Phone:  00 65 222 6022
  139 Cecil Street, No. 09-01 Cecil House                 Fax:    00 65 225 0428
  Singapore 0106                                          Email:  info@wkwebster.com.sg

- **AGENTS IN SOUTH AMERICA/MEXICO/CENTRAL AMERICA/WEST INDIES**
  Settling Agent: W.K. Webster (Overseas) Ltd.    Phone:  (212) 269-8220
  120 Wall Street                                 Fax:    (212) 363-9726
  New York, NY  10005                             Email:  info@wkwebster.com

The following Claim Documents must be forwarded to the Assurer or given to the surveyor:

- Bill of Lading
- Packing Slip
- Invoices
- Original Insurance Certificate
- Copy of Claim against carrier
- Survey report (if required)
- Customs consumption entry

## NOTICE TO AGENTS

It is important for all W.K. Webster Agents to note that they must submit claims/maintain contact with the nearest W.K. Webster office or fax to 614-895-7040 or email to northclaims@centurysurety.com.

SEA 1002 0606

# OCEAN CARGO POLICY

## CLAUSE INDEX

| Clause | Clause Title | Page |
|---|---|---|
| 12 | Accumulation | 5 |
| 1 | Assured | 3 |
| 2 | Attachment | 3 |
| 23 | Bill of Lading, etc. (Negligence) | 11 |
| 35 | Both To Blame | 13 |
| 55 | Brokers | 17 |
| 56 | Cancellation | 17 |
| 40 | Carrier | 14 |
| 45 | Concealed Damage | 15 |
| 17 | Consolidation/Deconsolidation | 7 |
| 37 | Constructive Total Loss | 14 |
| 44 | Container Demurrage | 15 |
| 46 | Control of Damaged Goods | 16 |
| 13 | Conveyances | 5 |
| 14 | Craft, Etc. | 5 |
| 30 | Debris Removal | 12 |
| 11 | Deductible | 5 |
| 8 | Delay Warranty | 4 |
| 28 | Deliberate Damage – Pollution Hazard | 12 |
| 29 | Deliberate Damage – United States/Canada Customs Service | 12 |
| 18 | Deviation | 7 |
| 47 | Difference in Conditions | 16 |
| 52 | Errors and Omissions | 17 |
| 26 | Explosion | 11 |
| 32 | Fraudulent Bills of Lading | 12 |
| 27 | Fumigation | 11 |
| 19 | General Average | 7 |
| 5 | Geographical Limits | 3 |
| 48 | Import Duty | 16 |
| 20 | Inchmaree | 7 |
| 54 | Inspection of Records | 17 |
| 4 | Interest Insured | 3 |
| 42 | Landing, Warehousing, Forwarding Charges, Packages Totally Lost | 15 |
| 10 | Limits of Liability | 4 |
| 9 | Loss of Use/Inherent Vice | 4 |
| 3 | Loss Payee | 3 |
| 39 | Loss Payment | 14 |
| 24 | Machinery | 11 |
| 15 | Marine Extension Clause (April, 1943) | 5-6 |
| 36 | Notice of Loss | 13-14 |
| 34 | Other Insurance | 13 |
| 21 | Paramount Warranties | 7-10 |
| 38 | Partial Loss | 14 |
| 49 | Payment of Premium | 16 |
| 6 | Perils | 3 |
| 41 | Refused/Return Shipments | 14 |
| 31 | Released Bill of Lading | 12 |
| 58 | Seepage And Pollution Exclusion | 18 |
| 25 | Shore Perils | 11 |
| 22 | South America | 11 |
| 50 | Subrogation | 17 |
| 51 | Subrogation Proceeds | 17 |
| 43 | Sue and Labor | 15 |
| 53 | Suit or Action | 17 |
| 7 | Terms of Average | 4 |
| 33 | Use of Special Policies/Certificates | 13 |
| 16 | Warehouse to Warehouse Clause | 6 |
| 57 | U. S. Economic & Trade Sanctions Clause | 18 |

# OCEAN CARGO POLICY

1) **ASSURED:** In consideration of premium to be paid at the rates agreed, the Assurer does insure the named party shown on the Declarations (herein called the Assured).

2) **ATTACHMENT:** This policy covers all shipments of goods and/or merchandise and/or property (hereafter referred to as "goods") listed in Clause 4 made on or after 12:01 A.M. standard time at the address of the Named Assured as stated herein  and continues until canceled by either party as per the cancellation provisions contained elsewhere within this policy.

3) **LOSS PAYEE:**  Loss, if any, payable to the Assured or order.

4) **INTEREST INSURED:**  This policy covers all shipments of lawful goods, of every kind and description consisting principally of the items described under Interest Insured on the Declarations including similar goods incidental to the business of the Assured, and including prepaid and/or advanced and/or guaranteed ocean freight under and/or on deck shipped by or consigned to the Assured and/or their agents and/or others, their own or that of others in which they may have an interest. Also, to cover all shipments made for the account of others which the Assured may agree or receive instructions to insure, provided such instructions are given prior to shipments or prior to any known or reported loss or damage; but excluding shipments sold or bought on terms whereby the Assured is not required to furnish insurance; provided that nothing in this clause shall be construed to prevent the Assured from effecting insurance hereunder on any shipments in which they have an insurable interest, including shipments to any subsidiaries of the Assured irrespective of the terms of sale.

5) **GEOGRAPHICAL LIMITS:** This policy covers property while in transit from ports and/or places in the world to ports and/or places in the world, via any route, direct or via ports and/or places in any order, excluding risks of shipment by land and/or air originating and terminating within the continental United States (meaning the forty-eight (48) contiguous states and the District of Columbia) and/or Canada but including intercoastal and coastwise shipments via water.

6) **PERILS:**  Touching the adventures and perils which this Assurer is contented to bear and take upon itself, they are of the seas and inland waters, fires, jettisons, assailing thieves, barratry of the Master and Mariners, and all other like perils, losses and misfortunes that have or shall come to the hurt, detriment or damage of the said goods and merchandise, or any part thereof, except as may be otherwise provided for herein or endorsed hereon.

# OCEAN CARGO POLICY

7) **TERMS OF AVERAGE:**

    **A.** Except while "On Deck" of an ocean vessel and subject to the terms of an "On Deck" Bill of Lading unless otherwise agreed to cover against all risks of physical loss or damage from any external cause irrespective of percentage; but excluding; nevertheless, those risks excepted by the Paramount Warranties, excepting to the extent that such risks are specifically covered by endorsement.

    **B.** Goods shipped "On Deck" without the knowledge and consent of the Assured and subject to the terms and conditions of an "Under Deck" Bill of Lading shall be insured subject to the "Under Deck" terms, conditions, rates and limit of liability as set forth in this policy.

    **C.** Goods shipped in intermodal containers and/or vans and/or lighters aboard ship shall be insured subject to the "Under Deck" terms, conditions and limit of liability as set forth in this policy whether stowed "Under and/or On Deck.

    **D.** Goods while "On Deck" of an Ocean Vessel or while on board any barge (unless barge is deemed a connecting conveyance) are subject to the terms of an "On Deck" Bill of Lading unless otherwise agreed are covered free of particular average unless the vessel and/or craft be stranded, sunk, burnt, on fire or in collision, but notwithstanding the foregoing this Assurer to pay any loss of or damage to the interest insured which may reasonably be attributed to collision or contact of the vessel and/or craft and/or conveyance with any external substance (ice included) other than water, or to discharge of cargo at port of distress; also including jettison and/or loss overboard irrespective of percentage.

    **E.** Goods shipped per aircraft and/or mail and/or parcel post are insured to cover against all risks of physical loss or damage from any external cause irrespective of percentage; but excluding; nevertheless, the risks of war, strikes, riots, seizure, detention and other risks, excluded by the F.C. & S. (Free of Capture and Seizure) Warranty and the S.R. & C.C. (Strikes, Riots and Civil Commotions) Warranty in this policy, excepting to the extent that such risks are specifically covered by endorsement.

8) **DELAY WARRANTY:** Warranted free of claim for loss of market or for loss, damage or deterioration arising from delay, whether caused by a peril insured against or otherwise.

9) **LOSS OF USE/INHERENT VICE:** This insurance in no case be deemed to cover loss, damage or expense proximately caused by loss of use or inherent vice or nature of the goods insured.

10) **LIMITS OF LIABILITY:** The Assurer shall not be liable under this policy for more than the limits shown under the Foreign Transit Limits of Liability on the Declarations.

If the total value at risk exceeds the limit of liability provided by this policy or any endorsement attached thereto, the Assured shall nevertheless report the full amount at risk to the Assurer and shall full premium thereon. Acceptance of such reports and premium by this Assurer shall not alter or increase the limit of liability of the Assurer for more than the full amount of covered loss up to but not exceeding the applicable limit of liability.

# OCEAN CARGO POLICY

**11) DEDUCTIBLE:** Each claim for loss or damage, except General Average and/or Salvage Charges, the sum shown on the Declarations be deducted; each Bill of Lading separately insured.

**12) ACCUMULATION:** Should there be an accumulation of interest beyond the limits expressed in this Policy by reason of any interruption of transit beyond the control of the Assured, or by reason of any casualty or at a transshipping point or on a connecting steamer or conveyance, this Policy shall cover for the full amount at risk (but in no event for more than twice the Policy Limit of Liability); provided notice be given to this Assurer as soon as known to the Assured.

**13) CONVEYANCES:** This policy covers all shipments by steamer, vessel, barge, air conveyance, railcar, truck and/or land conveyance and all connecting conveyances including mail and/or parcel post, messengers and couriers.

Wherever the words "Ship," "Vessel," " Seaworthiness," "Ship Owner" or "Vessel Owner" appear in this Policy they are deemed to include also "Aircraft," "Airworthiness," and "Aircraft Owner."

**14) CRAFT, ETC.:** Including the risk by craft, and/or lighter to and from the vessel; each craft, and/or lighter to be deemed separately insured. The Assured is not to be prejudiced by any agreement exempting lightermen from liability.

**15) MARINE EXTENSION CLAUSE (April, 1943):** Notwithstanding anything to the contrary contained in or endorsed on this Policy, it is understood and agreed that the following terms and conditions apply to all shipments: supersede and override the Warehouse to Warehouse Clause No. 16 and the Deviation Clause No.18 wherever they are inconsistent therewith and shall apply to all shipments which become at risk under this Policy.

   **A.** This insurance attaches from the time the goods leave the warehouse at the place named in the Policy, special Policy, certificate or declaration for the commencement of the transit and continues until the goods are delivered to the final warehouse at the original destination named in the Policy, special Policy, certificate or declaration, or substituted destination as provided in Clause 15. hereunder.

   **B.** This insurance specially covers the goods during:

      **i.** deviation, delay, forced discharge, reshipment and transshipment;

      **ii.** any other variation of the adventure arising from the exercise of a liberty granted to the shipowner or charterer under the contract of affreightment.

   In the event of the exercise of any liberty granted to the Shipowner or charterer under the contract of affreightment whereby such contract is terminated at a port or place other than the original destination named, the insurance continues until the goods are sold and delivered at such port or place; or, if the goods be not sold but are forwarded to the named destination or to any other destination, this insurance continues until the goods have arrived at final warehouse as provided in Clause 15.

# OCEAN CARGO POLICY

**(Clause 15 MARINE EXTENSION CLAUSE (April, 1943) Continued)**

    **C.** If while this insurance is still in force and before the expiry of fifteen (15) days from midnight of the day on which the discharge overside of the goods hereby insured from the overseas vessel at the final port of discharge is completed, the goods are resold (not being a sale within the terms of Clause 15.) and are to be forwarded to a destination other than that covered by this insurance, the goods are covered hereunder while deposited at such port of discharge until again in transit or until the expiry of the aforementioned fifteen (15) days, whichever shall first occur. If a sale is effected after the expiry of the aforementioned fifteen (15) days while this insurance is still in force, the protection afforded hereunder shall cease as from the time of the sale.

    **D.** Held covered, at a premium to be arranged, in case of change of voyage or of any omission or error in the description of the interest, vessel or voyage.

    **E.** This insurance shall in no case be deemed to extend to cover loss, damage or expense proximately caused by delay or inherent vice or nature of the subject matter insured.

    **F.** It is a condition of this insurance that there shall be no interruption or suspension of transit unless due to circumstances beyond the control of the Assured.

    **G.** All other terms and conditions of the Policy not in conflict with the foregoing remain unchanged, it being particularly understood and agreed that the F.C.& S. Clause remains in full force and effect and that nothing in the foregoing shall be construed as extending this insurance to cover any risks of war or consequences of hostilities.

**16) WAREHOUSE TO WAREHOUSE CLAUSE:** This insurance attaches from the time the goods leave the warehouse and/or store at the place named in the Policy for the commencement of the transit and continues during the ordinary course of the transit, including customary transshipment if any, until the goods are discharged overside from the overseas vessel at the final port. Thereafter the insurance continues whilst the goods are in transit and/or awaiting transit until delivered to final warehouse at the destination named in the Policy or until the expiry of the 15 days (or 30 days if the destination to which the goods are insured is outside the limits of the port) whichever shall first occur. The time limits referred to above to be reckoned from midnight of the day on which the discharge overside of the goods hereby insured from the overseas vessel is completed. Held covered at a premium to be arranged in the event of transshipment, if any, other than as above and/or in the event of delay in excess of the above time limits arising from circumstances beyond the control of the Assured.

IT IS NECESSARY FOR THE ASSURED TO GIVE PROMPT NOTICE TO THIS ASSURER WHEN THEY BECOME AWARE OF AN EVENT FOR WHICH THEY ARE "HELD COVERED" UNDER THIS POLICY AND THE RIGHT TO SUCH COVER IS DEPENDENT ON COMPLIANCE WITH THIS OBLIGATION.

# OCEAN CARGO POLICY

17) **CONSOLIDATION/DECONSOLIDATION:** Notwithstanding anything contained elsewhere herein to the contrary and subject to the terms of this policy, this insurance is extended to cover the goods insured hereunder whenever such goods are halted in transit, anywhere in the world, short of final destination, for the purpose of consolidation, deconsolidation, packing, repacking, containerization, decontainerization, distribution, or redistribution for a period not exceeding thirty (30) days after arrival at premises of the consolidators, truckers, or warehousemen. Held covered in excess of the above time at an additional premium if required.

18) **DEVIATION:** This insurance shall not be vitiated by an unintentional error in description of vessel, voyage or interest, or by deviation, overcarriage, change of voyage, transshipment or any other interruption in the ordinary course of transit from causes beyond the control of the Assured. Any such error, deviation or other occurrence mentioned above shall be reported to this Assurer as soon as known to the Assured and additional premium paid if required.

19) **GENERAL AVERAGE:** General Average and Salvage Charges are payable in full irrespective of insured and contributory values, in accordance with United States laws and usage and/or as per Foreign Statement and/or as per York-Antwerp Rules (as prescribed in whole or part) if in accordance with Contract of Affreightment.

20) **INCHMAREE:** This insurance is also covers any loss of or damage to the goods covered hereunder, through the bursting of boilers, breakage of shafts or through any latent defect in the machinery, hull or appurtenances, or from faults or errors in the navigation and/or management of the vessel by the master, officers, crew, engineers or pilots.

21) **PARAMOUNT WARRANTIES:** The following warranties shall be paramount and shall not be modified or superseded by any other provision included herein or stamped or endorsed hereon unless such other provision refers specifically to the risks excluded by these Warranties and expressly assumes said risks:

   A. **F.C.& S. WARRANTY (FREE OF CAPTURE & SEIZURE -April 3, 1980):**

   NOTWITHSTANDING ANYTHING HEREIN CONTAINED TO THE CONTRARY, THIS INSURANCE IS WARRANTED FREE FROM:

   I. capture, seizure, arrest, restraint, detainment, confiscation, preemption, requisition or nationalization and the consequences thereof or any attempt thereat, whether in time of peace or war, and whether lawful or otherwise;

   II. all loss, damage or expense, whether in time of peace or war caused by:

   a. any weapon of war employing atomic or nuclear fission and/or fusion or other reaction or radioactive active force or matter or

   b. any mine or torpedo or other derelict weapons of war;

# OCEAN CARGO POLICY

**(Clause 21 PARAMOUNT WARRANTIES Continued)**

    iii.  all consequences of hostilities or warlike operations (whether there be a declaration of war or not), but this warranty shall not exclude collision or contact with aircraft, or with rockets or similar missiles (other than weapons of war) or with any fixed or floating object (other than a mine or torpedo), stranding, heavy weather, fire or explosion unless caused directly (and independently of the nature of the voyage or service which the vessel concerned or, in the case of a collision, any other vessel involved therein is performing) by a hostile act by or against a belligerent power; and for the purpose of this warranty, "power" includes any authority maintaining naval, military or air forces in association with a power;

    iv.  war, civil war, revolution, rebellion, insurrection, or civil strife arising therefrom; from the consequences of the imposition of martial law, military or usurped power; or piracy; or any hostile acts by or against a belligerent power

## B. S.R.&C.C. WARRANTY (STRIKES, RIOTS, & CIVIL COMMOTIONS – Dec. 2, 1993)

NOTWITHSTANDING ANYTHING HEREIN CONTAINED TO THE CONTRARY, THIS INSURANCE IS WARRANTED FREE FROM LOSS, DAMAGE OR EXPENSE CAUSED BY OR RESULTING FROM:

    i.  strikes, locked-out workman, labor disturbances, riots, civil commotions, or the acts of any person or persons taking part in any such occurrences or disorders;

    ii.  vandalism, sabotage or malicious act, which shall be deemed also to encompass the act or acts of one or more persons, whether or not agents of a sovereign power, carried out for political, terroristic or ideological motives and/or purposes and whether any loss, damage or expense resulting therefrom is accidental or intentional.

## C. NUCLEAR EXCLUSION (APRIL 1, 1991):

Notwithstanding anything to the contrary herein, it is hereby understood and agreed that this policy shall not apply to any loss, damage or expense due to or arising out of, whether directly or indirectly, nuclear reaction, radiation, or radioactive contamination, regardless of how it is caused. However, subject to all provisions of this policy, if this policy is insures against fire, then direct physical damage to the property insured located within the United States, or any territory of the United States or Puerto Rico by fire directly caused by the above excluded perils, is insured, provided that the nuclear reaction, radiation, or radioactive contamination was not caused, whether directly or indirectly, by any of the perils excluded by the F.C. & S. Warranty of this policy.

Nothing in this clause shall be construed to cover any loss, damage, liability or expense caused by nuclear reaction, radiation, or radioactive contamination arising directly or indirectly from the fire mentioned above.

04/10/2009 11:07 AM 98613_00647

# OCEAN CARGO POLICY

## D.  TERMINATION OF TRANSIT:

i.   Notwithstanding any provision to the contrary contained in this Policy or the Clauses referred to therein, it is agreed that in so far as this Policy covers loss of or damage to the subject-matter insured caused by any terrorist or any person acting from a political motive, such cover is conditional upon the subject-matter insured being in the ordinary course of transit and, in any event, **SHALL TERMINATE:**

**either**

1.1 As per the transit clauses contained within the Policy,

**or**

1.2 on delivery to the Consignee's or other final warehouse or place of storage at the destination named herein,

1.3 on delivery to any other warehouse or place of storage, whether prior to or at the destination named herein, which the Assured elect to use either for storage other than in the ordinary course of transit or for allocation or distribution,

**or**

1.4 in respect of marine transits, on the expiry of 60 days after completion of discharge overside of the goods hereby insured from the oversea vessel at the final port of discharge,

1.5 in respect of air transits, on the expiry of 30 days after unloading the subject-matter insured from the aircraft at the final place of discharge,

**whichever shall first occur.**

ii   If this Policy or the Clauses referred to therein specifically provide cover for inland or other further transits following on from storage, or termination as provided for above, cover will re-attach, and continues during the ordinary course of that transit terminating again in accordance with clause 1.

## E.  CHEMICAL, BIOLOGICAL, BIO – CHEMICAL, ELECTROMAGNETIC WEAPONS EXCLUSION CLAUSE

In no case shall this insurance cover loss, damage, liability or expense, directly or indirectly caused by, or contributed to by, or arising from an actual or threatened act involving a chemical, biological, bio-chemical or electromagnetic weapon, device, agent or material when used in an intentionally hostile manner.

# OCEAN CARGO POLICY

### F. INSTITUTE CYBER ATTACK EXCLUSION CLAUSE (CL 380) 10/11/03

1.1 Subject only to clause 1.2 below, in no case shall this insurance cover loss damage liability or expense directly or indirectly caused by or contributed to by or arising from the use or operation, as a means for inflicting harm, of any computer, computer system, computer software program, malicious code, computer virus or process or any other electronic system.

1.2 Where this clause is endorsed on policies covering risks of war, civil war, revolution, rebellion, insurrection, or civil strife arising therefrom, or any hostile act by or against a belligerent power, or terrorism or any person acting from a political motive, Clause 1.1 shall not operate to exclude losses (which would otherwise be covered) arising from the use of any computer, computer system or computer software program or any other electronic system in the launch and/or guidance system and/or firing mechanism of any weapon or missile.

### G. EXTENDED RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE WITH U.S.A. ENDORSEMENT (3/1/03)

1. In no case shall this insurance cover loss damage liability or expense directly or indirectly caused by or contributed to by or arising from

    1.1 ionizing radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel

    1.2 the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof

    1.3 any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter.

    1.4 the radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter. The exclusion in this sub clause does not extend to radioactive isotopes, other than nuclear fuel, when such isotopes are being prepared, carried, stored, or used for commercial, agricultural, medical, scientific or other similar peaceful purposes.

2. Notwithstanding Paragraph 1:
    if fire is an insured peril

    and

    where the subject matter insured is within the U.S.A., its islands, onshore territories or possessions

    and

    a fire arises directly or indirectly from one or more of the causes detailed in sub-clauses 1.1, 1.2 and 1.4 above, any loss or damage arising directly from that fire shall, subject to the provisions of this insurance, be covered, EXCLUDING however any loss damage liability or expense caused by nuclear reaction, nuclear radiation or radioactive contamination arising directly or indirectly from that fire.

# OCEAN CARGO POLICY

22) **SOUTH AMERICA:** For all shipments to South America:

    **A.** Notwithstanding anything contained elsewhere herein to the contrary (particularly the Warehouse to Warehouse and Marine Extension Clauses), the insurance provided hereunder shall continue to cover the cargo for sixty (60) days (ninety (90) days on shipments via the Magdalena River) after completion of discharge of the overseas vessel at port of destination or until the goods are delivered to the final warehouse at destination, whichever may first occur, and shall then terminate.

    **B.** The time limit referred to above to be reckoned from midnight of the day on which the discharge of the overseas vessel is completed.

23) **BILL OF LADING, ETC. (NEGLIGENCE):** The Assured is not to be prejudiced by the presence of the negligence clause and/or latent defect clause in the Bills of Lading and/or Charter Party and/or contract of affreightment. The seaworthiness of the vessel and/or craft as between the Assured and this Assurer is hereby admitted, and this Assurer agrees that in the event unseaworthiness or a wrongful act or misconduct of Shipowner, charterer, their agents or servants shall, directly or indirectly, cause loss or damage to the goods covered under this Policy, this Assurer will (subject to the terms of average and other conditions of the Policy) pay to an innocent Assured the resulting loss. With leave to sail with or without pilots and to tow and assist vessels or craft in all situations and to be towed.

24) **MACHINERY:** When the goods covered hereunder include a machine consisting when complete for sale or use of several parts, then, in case of loss or damage covered by this insurance to any part of such machine, this Assurer shall be liable only for the value of the part lost or damaged, or at the Assured's option, for the cost and expense, including labor and forwarding charges, of replacing or repairing the lost or damaged part; but in no event shall this Assurer be liable for more than the insured value of the complete machine.

25) **SHORE PERILS:** Notwithstanding any average warranty to the contrary this Policy to cover while on docks, wharves, quays or elsewhere on shore and/or during land transportation against loss, damage or expense caused by fire, sprinkler leakage, lightning, cyclone, hurricane, earthquake, windstorm, hail, landslide, volcanic eruption, flood, rising water, aircraft, objects falling from aircraft, collision, derailment and/or any accident to the conveyance, collapse and/or subsidence of docks, wharves, quays and/or structures.

26) **EXPLOSION:** Notwithstanding any average warranty to the contrary this Policy to cover loss, damage or expense resulting from explosion, howsoever or wheresoever occurring, irrespective to percentage, excluding those risks excepted by the Free of Capture and Seizure and the Strikes, Riots and Civil Commotions Warranties.

27) **FUMIGATION:** In the event of a conveyance or location, being fumigated and loss or damage to the Assured's goods results therefrom, this Assurer agrees to indemnify the Assured for such loss or damage and the Assured agrees to subrogate to this Assurer any recourse that the Assured may have for recovery of such loss or damage from others.

# OCEAN CARGO POLICY

28) **DELIBERATE DAMAGE – POLLUTION HAZARD:** This policy covers, but only while the goods insured are on board a waterborne conveyance, loss of or damage to said goods directly caused by governmental authorities acting for the public welfare to prevent or mitigate a pollution hazard or threat thereof, provided that the accident or occurrence creating the situation which required such governmental action would have resulted in a recoverable claim under the policy (subject to all of its terms, conditions and warranties) if the goods insured would have sustained physical loss or damage as a direct result of such accident or occurrence.

This coverage shall not increase the Limits of Liability provided for in Clause 10.

29) **DELIBERATE DAMAGE – UNITED STATES/CANADA CUSTOMS SERVICE:** This insurance also covers (notwithstanding the Free of Capture and Seizure warranty contained in this policy) physical loss or damage to the goods insured arising out of the performance of inspection duties while in the care, custody or control of the U.S. or Canadian Customs Service or another duly authorized governmental agency of the U.S. or Canada while performing inspection duties for the US or Canadian Customs Service.

30) **DEBRIS REMOVAL:** This insurance also covers, subject to policy TERMS OF AVERAGE (Clause 7), the risk of default or failure of any carrier or bailee to meet their contractual or legal obligations for the removal of debris of property insured. This coverage provides for expenses incurred by the Insured for removal and disposal of the debris of the property insured, by reason of damage thereto caused by an insured peril, but excluding absolutely:

   A. Any expenses incurred in consequence of or to prevent or mitigate pollution or contamination, or any threat or liability therefor.

   B. The cost of removal of cargo from any vessel or connecting craft.

   In no case shall the Assurer be liable under this clause for more than 25% of the insured value of the damaged property insured or $50,000, whichever is less, any one occurrence.

   It is warranted that no expense shall be paid without the written consent of the Assurer.

31) **RELEASED BILL OF LADING:** Privilege is hereby granted the Assured to ship goods covered by this Policy under released or limited Bills of Lading, shipping receipts or other contracts of affreightment without prejudice to this insurance; subject to payment of additional premium, if required.

32) **FRAUDULENT BILLS OF LADING:** This Policy also covers physical loss or damage through the acceptance by the Assured and/or their Agents and/or Shippers of fraudulent Bills of Lading and/or Shipping Receipts and/or Messenger Receipts.

# OCEAN CARGO POLICY

33) **USE OF OCEAN CARGO CERTIFICATES:** Authority is hereby given the Assured or duly authorized representative of the Assured to issue the Assurer's Ocean Cargo Certificates of Insurance on the form supplied by the Assurer on any and/or all shipments insured hereunder, strictly subject to the terms and conditions of this Policy. All Ocean Cargo Certificates of Insurance shall be countersigned by the Assured or a duly authorized representative of the Assured.

The Assured agrees to furnish a copy of each completed certificate to the Assurer as soon after its completion as practical but not later than 30 days after issuance. The original and duplicate portions of each spoiled or voided certificates shall be returned to this Assurer. All unused certificates shall be immediately returned to the Assurer upon letter request at any time. Upon termination of the Policy, all unused certificates shall be returned to the Assurer. Assured shall hold Assurer harmless against any sums Assurer may be caused to pay and shall defend Assurer against any sums Assurer may be called upon to pay due to Assured's improper or unauthorized issuance of certificates.

34) **OTHER INSURANCE:** In case the goods hereby covered are covered by other insurance (except as hereinafter provided) the loss shall be collected from the several policies in the order of the date of their attachment, insurance attaching on the same date to be deemed simultaneous and to contribute pro rata; provided, however, that where any fire insurance or any insurance (including fire) taken out by any carrier or bailee (other than the Assured) is available to the beneficiary of this Policy, or would be so available if this insurance did not exist, then this insurance shall be void to the extent that such other insurance is or would have been available. It is agreed nevertheless, that where this Assurer is thus relieved of liability because of the existence of other insurance, this Assurer shall receive and retain the premium payable under this Policy and, in consideration thereof shall guarantee the solvency of the companies and/or underwriters who issue such other insurance and the prompt collection of the loss thereunder to the same extent (only) as the Assurer shall have been relieved of liability under the terms of this clause, but not exceeding, in any case, the amount which would have been collectible under this Policy if such other insurance did not exist.

Nothing in this clause shall be construed as preventing the Assured from effecting specific insurance on property in storage where permission to effect such specific insurance is granted elsewhere in this Policy.

35) **BOTH TO BLAME:** Where goods are shipped under a Contract of Affreightment containing the so-called "Both to Blame Collision Clause," this Assurer agrees as to all losses covered by this insurance to indemnify the Assured for any amount (not exceeding the amount insured under this Policy) which the Assured may be legally bound to pay to the Shipowner under such clause. In the event that such liability is asserted, the Assured agrees to notify the Assurer, who shall have the right at their own cost and expense to defend the Assured against such claim.

36) **NOTICE OF LOSS:** In case of loss or damage to the goods covered hereunder, the Assured shall report to their insurance broker for transmission to this Assurer, or to an agent of this Assurer, if there be one at or near the place where the loss occurs, or expenses are incurred, or, if there be none in the vicinity, to the nearest Settling Agent (refer to Instructions in Case of Loss found at the front section of this policy), every loss or damage under this insurance as soon as practicable after it becomes known to the Assured. It is agreed that claim agents or settling agents are to intervene only for the purpose of ascertaining and reporting the nature, cause and extent of the

# OCEAN CARGO POLICY

loss or damage and that they shall not be cited in any legal proceedings. Failure to report loss or damage promptly and to file such proof of loss shall invalidate any claim under this policy. The Assured and/or Certificate Holder agree to be examined under oath if so requested by the Assurer.

37) **CONSTRUCTIVE TOTAL LOSS:** No recovery for a constructive total loss shall be had under this policy unless:

    **A.** The insured goods and/or merchandise and/or property are reasonably abandoned on account of their actual total loss appearing to be unavoidable, or

    **B.** because they cannot be preserved from actual total loss without incurring an expenditure which, if incurred, The Insured reasonably believes would exceed the expected value of the goods and/or merchandise and/or property.

38) **PARTIAL LOSS:** In all cases of damage by perils insured against, the loss shall, as far as practicable, be ascertained by a separation and a sale or appraisement of the damaged portion only of the contents of the packages so damaged and not otherwise. The cost and expense of sorting sound and damaged goods to be initially borne by the Assured and form part of the claim on the Assurer in accordance with Clause 40 herein.

39) **LOSS PAYMENT:** In case of loss, such loss to be paid not later than (30) days after proof of loss and proof of interest in the goods hereby covered are presented and received by this Assurer. Proofs of loss to be authenticated by the agents of this Assurer, if there be one at the place such proofs are taken.

40) **CARRIER:** Warranted that this insurance shall not inure, directly or indirectly, to the benefit of any carrier or bailee.

41) **REFUSED/RETURNED SHIPMENTS:** Provided reported to this Assurer as soon as practicable, this Policy shall cover, subject to original insuring conditions, goods refused by consignees or which remain at the risk of the Assured beyond the normal course of transit until disposed of by the Assured by return to the port of shipment or otherwise at an additional premium to be agreed. In no event shall this insurance cover after delivery of the goods to the consignee nor shall it inure to the benefit of the consignee.

# OCEAN CARGO POLICY

**42) LANDING, WAREHOUSING & FORWARDING CHARGES, PACKAGES TOTALLY LOST:**
Notwithstanding any average warranty contained herein, this Assurer agrees to pay any landing, warehousing, forwarding or other expenses and/or special charges for which this Policy in the absence of such warranty would be liable as well as any partial loss arising from transshipment. Also to pay the insured value of any package or packages which may be totally lost in loading, transshipment or discharge.

This insurance is also to pay landing, warehousing, forwarding and special charges as a result of insolvency or financial default of the owners, charterers, managers or operators of the vessel. In no event, however, shall this insurance cover if at the time of loading of the subject matter insured on board the vessel, the Assured is aware or, in the ordinary course of business should be aware that such insolvency or financial default could prevent the normal prosecution of the voyage.

**43) SUE AND LABOR:** In case of any imminent or actual peril, loss or misfortune, it shall be lawful and necessary to and for the Assured, his or their factors, servants and assigns, to sue, labor and travel for, in and about the defense, safeguard and recovery of the said goods, or any part thereof, without prejudice to this insurance; nor shall the acts of the Assured or the Assurer, in recovering, saving and preserving the goods covered, in case of disaster, be considered a waiver or an acceptance of an abandonment.

**44) CONTAINER DEMURRAGE:** This policy also covers demurrage charges and/or late penalties, subject TERMS OF AVERAGE (Clause 7), assessed against, and paid by, the Insured for late return of containers when said containers are retained by the Assured at the instruction of the Assurers for inspection by an appointed surveyor in investigation of loss or damage recoverable under the policy.

**45) CONCEALED DAMAGE:** Should the opening of any package after arrival be delayed, and loss or damage which can reasonably be shown to have occurred prior to delivery to final destination be found when packages are eventually opened, but not later than thirty (30) days after arrival at final destination, such loss shall be adjusted and paid by the Assurer in the same manner as though the packages had been immediately opened upon arrival, provided such loss or damage is otherwise recoverable under the TERMS OF AVERAGE (Clause 7).

Packages showing external evidence of damage are to be opened immediately or coverage provided herein shall not apply to such packages.

In the event that packages of the above mentioned goods are not to be opened within the above mentioned limit, additional time may be granted, at rates to be agreed, provided notice be given to the Assurer prior to the expiration of the time limit agreed upon.

# OCEAN CARGO POLICY

**46) CONTROL OF DAMAGED GOODS:** Notwithstanding anything contained herein to the contrary, in case of damage to goods covered under this Policy, the Assured is to retain control of all damaged goods. The Assured, however, agrees wherever practicable to recondition and sell such goods after removal of all brands and trademarks.

Where the disposal or sale of such damaged goods is, in the opinion of the Assured, detrimental to their interest (or which they are unable to sell or dispose of under their agreement with any trade association), such damage shall be treated as a constructive total loss and the Assured shall dispose of the damaged goods to the best advantage, this Assurer being entitled to such proceeds, or they shall be destroyed in the presence of a representative of this Assurer and the Assured.

**47) DIFFERENCE IN CONDITIONS:** It is understood and agreed that on all shipments purchased by the Insured on C.I.F. (Cost, Insurance, Freight) terms; this policy covers the difference in conditions between such other insurance and the terms and conditions of insurance provided in this policy for the property involved.

All shipments insured hereunder to be valued at the amount of the seller's insurance but subject always to the limits of liability provided in this policy.

The Insured agrees to declare all such shipments to the Assurers and pay premium thereon at rates listed in the rate schedule.

**48) IMPORT DUTY:** This insurance also covers the risk of loss, by reason of perils insured against, on duties imposed on goods covered hereunder, it being understood and agreed, however, that when the risk upon the goods continues beyond the time of landing from the overseas vessel, the increased value, consequent upon the payment of such duties, shall attach as an additional insurance upon the goods from the time such duty is paid or becomes due, to the extent of the amounts thereof actually paid or payable.

The Assured warrants that on all risks insured hereunder a separate amount shall be reported sufficient to cover the said duty, upon which the rate of premium shall be an agreed percentage of the rate named for the subject goods.

The Assured will, in all cases, use reasonable efforts to obtain abatement or refund of duties paid or claimed in respect of goods lost, damaged or destroyed. It is further agreed that the Assured shall, when the Assurer so elects, surrender the goods to the Custom authorities and recover duties thereon as provided by law, in which event the claim under this Policy shall be only for a total loss of the goods so surrendered and expenses which shall include the expense of surrendering the merchandise to the Customs authorities.

**49) PAYMENT OF PREMIUM:** This Assurer is entitled to premiums at agreed rates on all shipments, reported or not, in respect of which insurance is provided hereunder. All premiums are to be paid monthly unless otherwise agreed. Willful failure to so declare or to pay premiums when due shall (at the option of the Company) render this Policy null and void as and from the date of such failure.

# OCEAN CARGO POLICY

**50)** **SUBROGATION:** It is a condition of this insurance that upon payment of any loss, the Assurer shall be subrogated to all rights and claims against third parties arising out of such loss. It is a further condition of this insurance that if the Assured or their assigns have entered or shall enter into any special agreement whereby any carrier, bailee, or other third party is released from its contractual, common law or statutory liability for any loss, or have or shall have waived, compromised, settled or otherwise impaired any rights and claims against any carrier, bailee, or third party to which the Assurer would be subrogated upon payment of a loss without prior agreement of these Assurers and endorsement hereon, the Assurer shall be free from liability with respect to such loss but its right to retain or recover the premium shall not be affected.

**51)** **SUBROGATION PROCEEDS:** In the event of subrogation recovery on a loss recovered by the Assured under this policy where the Assured bore a deductible, the net subrogation proceeds shall be paid proportionately between the Assurer and the Assured.

**52)** **ERRORS AND OMISSIONS:** This insurance shall not be prejudiced by any unintentional delay or omission in reporting hereunder or any unintentional error in the amount or the description of the interest, vessel or voyage, or if the subject matter of the insurance be shipped by another vessel, if prompt notice be given to the Assurer as soon as said facts become known to the Assured and additional premium paid if required.

**53)** **SUIT OR ACTION:** No suit, action, or proceeding against the Assurer for recovery of any claim shall be sustained unless commenced within twelve (12) months from the date of the happening of the loss out of which the Claim arises, provided that, if such limitation is invalid by the laws of the state within which this Policy is issued, then such suit, action, or proceeding shall be barred unless commenced within the shortest limit of time permitted by the laws of such state.

**54)** **INSPECTION OF RECORDS:** It is a condition of this policy that the Assurers may examine and audit the books and records of the Assured as they relate to this policy at any time during the policy period and within twelve (12) months after termination of this policy.

**55)** **BROKERS:** It is a condition of this Policy, and it is hereby agreed that the intermediary named in this Policy, or any substituted intermediary, shall be deemed to be exclusively the agents of the Assured and not of the Assurer in any and all matters relating to, connected with or affecting this insurance. Any notice given or mailed by or on behalf of the Assurer to the said broker in connection with or affecting this insurance, or its cancellation shall be deemed to have been delivered to the Assured.

**56)** **CANCELLATION:** This policy to be deemed continuous and to cover all property insured as provided until canceled by either party giving the other thirty (30) days written notice (10 days by the Assurer in the case of non-payment of premium) but such cancellation shall not affect any risk on which this insurance has attached prior to the effective date of such cancellation.

# OCEAN CARGO POLICY

**57) U.S. ECONOMIC AND TRADE SANCTIONS CLAUSE:** Whenever coverage provided by this policy would be in violation of any U.S. economic or trade sanctions such as, but not limited to, those sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), such coverage shall be null and void.

Similarly, any coverage relating to or referred to in any certificates or other evidences of insurance or any claim that would be in violation of U.S. economic or trade sanctions as described above shall also be null and void.

**58) SEEPAGE AND POLLUTION EXCLUSION CLAUSE:**

1. This policy excludes claims in respect of liability incurred by the Assured for direct or indirect loss or damage by seepage, pollution or contamination:

   a. On or over land or inland waters unless caused by a sudden event or insured on a sudden and accidental basis; or

   b. Caused by disposal or dumping of waste.

2. Nevertheless, claims in respect of the following shall not be excluded by this clause:

   Liability under:

   (1)   Offshore Pollution Liability Agreement;

   (2)   the Outer Continental Shelf Lands Act, Federal Water Quality Improvement Act, Arctic Waters Pollution Act;

   (3)   Seepage, pollution or contamination from or caused by vessels, craft or their cargoes;

   (4)   General average.

# OCEAN CARGO POLICY

**RATING SCHEDULE**

For goods covered by this policy shipped by regular line metal, self-propelled surface vessels not less than 1,000 tons net register operating in their regular trade and which are classed A1 American Record or equivalent by a Member of the International Association of Classification Societies or which are not over twenty (20) years of age but excluding however, (a) vessels built for service on the Great Lakes and (b) vessels built for military or naval service, (c) vessels built during World War II (including rail and/or truck connections to or from interior points), and (d) for the carriage of dry bulk or liquid bulk cargoes, and which are less than 16 years of age, unless otherwise stated are as follows:

On goods described in Clause 4:
.04% excl. war, based on gross receipts of $175,000.00
$25 per auto-Used Automobiles
$15 per auto-Samskip Used Automobiles

Alcoholic Beverage Freezing rates:
$30 Rail Car
$150 Intermodal Container

Warehouseman's Legal Liability Rates:
.40% Virginia Location
.15% Michigan Location

- Import Duty (if applicable) is 1/3 of the above listed rate by conveyance.
- Difference in Condition (if applicable) rates are 40% of the above listed rate by conveyance.

**The above rates are per $100 of insurance and are subject to change on 30 days notice. War rates are subject to change on 48 hour notice.**

**War/SR&CC Coverage to and within the following locations are to be submitted to the Company for approval prior to any shipment commencement. Failure to secure approval will void coverage for War/SR&CC while in transit to areas listed below:**
**North Korea, Iraq, Iran, Syria, Lebanon, Kosovo, Afghanistan, Congo, Rwanda, and Democratic Republic of Congo.**

Rates other than above or shown as N/A are to be determined by this Assurer at the time of shipment.

All other terms and conditions of the Ocean Cargo Policy and its endorsement(s) remain unchanged,

Authorized Representative

SEA 1073A 0606

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# DOMESTIC INTERMEDIARY CONTINGENT LIABILITY ENDORSEMENT

This endorsement modifies insurance provided under the following:

### OCEAN CARGO COVERAGE

In consideration of an additional premium to be paid at rates stated in the Rating Schedule attached, this policy is extended to cover the legal liability of the Assured for:

A.  100% interest in all shipments of lawful goods and/or merchandise as described in the declarations except as hereinafter provided, for direct physical loss or damage to the property of others for which the Assured is held liable, or assumes liability prior to any known or reported loss, in any operating environment the Assured provides services while in due course of transit within the territorial limits of the United States, Canada and Mexico, specifically excluding waterborne shipments except for where such waterborne transportation is incidental as a connecting conveyance; unless a superseding statement of territorial limits appears hereafter; and

B.  for the contingent liability interest of the Assured for direct physical loss or damage to the property of others where the carrier and/or bailee, in whose custody and/or under whose responsibility the goods are at time of loss, do not provide settlement within a reasonable time after presentation of full proof of loss and provided that liability has been established; and

C.  for direct physical loss or damage to the property of others for which the Assured is held liable, or has a contingent liability, to goods and/or merchandise temporarily held in custody of the Railway Express Company or other carrier in charge of such carrier's "On Hand Department" awaiting disposition instructions, not exceeding 90 days, unless endorsed herein, and including returned and/or refused shipments; and

D.  for direct physical loss or damage to the property of others for which the Assured is held liable, or has a contingent liability, occasioned by fraud or deceit perpetrated by any person or persons who may represent themselves as the proper party to receive the property for shipment or accept it for delivery; and

E.  for direct physical loss or damage to the property of others for which the Assured is held liable, or has a contingent liability, to import shipments within the its geographic limits after marine insurance has ceased to attach, and export shipments within its geographic limits until laden on board international transit conveyance or until marine insurance attaches, whichever may first occur; and

F.  for direct physical loss or damage to the property of others for which the Assured may be held liable, or may have a contingent liability, to equipment of others consisting of transportation conveyances being semi-trailers, trailers, containers, and chassis including special equipment, accessories and mechanical refrigeration units. This coverage shall be applicable only as respects the Assured's contractual liability and/or legal liability assumed under "Interchange Agreements." The insurance under this section shall apply only as excess insurance over any other valid and collectible insurance available to any party at interest.

04/10/2009 11:07 AM 98613_00547

SEA 1073A 0606

Also to pay, in the event of loss or damage to property insured by this Policy, the Assured's earned freight charges not collected from others, subject always to the applicable limits of liability and deductibles as expressed elsewhere in this Policy. The inclusion of freight charges in any payment of claim(s) made to a shipper, consignee, or other party making such valid claim shall relieve the Assurer of any liability to also pay such earned freight charges to the Assured. Also to pay all legal expenses and costs incurred in defending claims founded or unfounded in respect of the insurance provided herein.

1.  **LIMIT OF LIABILITY**

    The Assurer shall be liable, irrespective of values at risk, shall not be liable for more than the amount shown in the Declaration, any one loss, accident or occurrence for all coverages combined, including legal costs fees and/or expenses.

2.  **DEDUCTIBLE**

    From the amount of each claim recoverable hereunder the sum shown on the Declarations shall be deducted per bill of lading per occurrence.

3.  **EXCLUSIONS**

    This policy does not cover:

    A.  Liability in respect to loss or damage to live animals, poultry, eggs, furs and/or garments trimmed with fur, and/or fresh produce;

    B.  Liability for loss of or damage to containers and/or real property except to the extent such may be cargo and/or merchandise consolidated and/or carried by the Assured;

    C.  Liability in respect to loss or damage to accounts, bills, deeds, currency, evidences of debt, securities, documents, drawings, letters of credit, notes, valuable papers; jewelry, precious stones, and/or bullion;

    D.  Liability in respect to loss or damage to property shipped by mail;

    E.  Liability in respect to loss or damage to paintings, statuary, and/or other works of art;

    F.  Liability in respect to loss or damage to trucks, automobiles, trailers, chassis, and/or equipment or appurtenances thereto. This exclusion however does not apply to electric automobiles and truck trailers shipped as freight. Additionally, this exclusion does not apply to used automobiles however the policy will only cover liability in respect to loss or damage caused by or resulting from fire, collision, upset/overturn of conveyance, and theft or non-delivery.;

    G.  Liability for loss or damage arising from loss of market, consequential loss, damage and/or deterioration arising from delay howsoever caused;

    H.  Liability for loss or damage arising from extremes in temperature and/or atmospheric pressure;

    I.  Liability for loss or damage arising from gradual deterioration, wear and tear, inherent vice, insects and/or vermin;

    J.  Liability for loss or damage arising from infidelity, conversion, secretion, misappropriation or other dishonest act on the part of the Assured, his agents and/or employees, and/or others to whom the property has been entrusted, carriers for hire excepted;

    K.  Liability for loss or damage arising from pilferage from shipper's load and count containers and/or conveyances, unless original seal shows evidence of tampering;

SEA 1073A 0606

L.  Liability for loss or damage arising from unexplained loss, mysterious disappearance, and/or shortage upon taking inventory;

M.  Liability for loss or damage arising from the neglect of the Assured to use all reasonable means to save and/or preserve the property of interest at the time of or subsequent to any occurrence giving rise to loss and/or damage;

N.  Liability for loss or damage arising from inadequate packing or improper preparation of cargo by company loading the trailer and/or container, or from insecure stowage when not stowed by the carrier. Sufficient packing and/or proper preparation of cargo shall include, but not be limited to guidelines and rules as established under the Uniform Freight Classification (UFC) 6000 series; the National Motor Freight Council (NMFG) 100 series; Association of American Railroads (AAR) 43 Series: and/or other carrier approved guides or circulars as applicable for the mode of transit;

O.  Liability for loss or damage arising from rust, oxidation, discoloration and/or loss or damage occasioned by water on shipments shipped on flatbed trailers and/or open-top containers;

P.  Loss of life or personal injury, howsoever caused;

Q.  Liability for loss, damage or expense including legal costs incurred defending a claim founded or unfounded under the deductible referenced above;

R.  Loss or damage to property owned, leased or rented by the Assured;

S.  Liability for loss or damage that would  be covered by the terms and conditions of the standard Comprehensive General Liability Policy as promulgated by the Insurance Service Organization (ISO);

T.  Liability for loss or damage assumed by the Assured under contract or otherwise in extension of the liability imposed upon the Assured by law in the absence of contract unless with the express written consent of the Assurer;

U.  Liability for loss or damage to shipments of property which are specifically excluded from the Tariff, Bill of Lading, Waybill, or Freight Receipt of the carriers with which the Assured has arranged transportation.

## 4.   CLAIMS AND CLAIMS PROCEDURES

In the event of any occurrence which may result in loss, damage and/or expense for which the Assurer may become liable under this insurance, notice thereof shall be given to the Assurer as soon as practicable and all documents relating to such occurrence shall be forwarded promptly to the Assurer or its designated agent, and the assured shall not admit liability without prior written consent of the Assurer.  Whenever required by the Assurer, the Assured shall cooperate with the Assurer (at the latter's expense) in all maters which the Assurer may deem necessary in the defense of any claim or suit or appeal from any judgment in respect of any occurrence as herein before provided.  In cases where the liability of the Assured as aforesaid investigation and/or contested with the consent of the Assurer, this policy shall be liable for and will also pay in full, costs and expenses paid and incurred in investigation, contesting or settling liability.  This Insurance shall be void and of no force or effect, in respect of any accident or occurrence in the event the Assured interferes in any negotiations of the Assurer for settlement or in any legal proceeding in respect of any claim for which the Assurer is or may be liable under this insurance.

## 5.   SUBROGATION

The Assurer shall be subrogated to all the rights which the Assured may have against any other person or entity, in respect of any claims of payment made under this policy to the extent of such payment, and the Assured shall upon the request of the Assurer, execute all documents necessary to secure to the Assurer such rights.

SEA 1073A 0606

6. **ACTION AGAINST THE ASSURER**

No action shall lie against the Assurer unless the Assured shall have fully complied with all the terms and conditions of this policy, nor until the amount of the Assured's obligation to pay shall have been finally determined either by judgment against the Assured, the claimant, or the Assurer, nor unless same shall be commenced within twelve (12) months the final judgment or decree is entered in the litigation against the Assured, or in case the claim against the Assurer accrues without the entry of twelve (12) months from the date of the payment of such claim; provided that where such limitation of time is prohibited by the laws of the State wherein this policy is issued, then no such suit or action shall be sustainable unless commenced within the shortest limitation of time permitted by the laws of such State.

No claim or demand against the Assurer under this policy shall be assigned to or transferred to a third party and additionally, no person, excepting a legally appointed receiver of the property of the Assured, shall acquire any rights against the Assurer by virtue of this insurance without the expressed consent of the Assurer.

7. **LOSS PAYMENT**

In the event of loss recoverable hereunder such loss to be paid within thirty (30) days after presentation and acceptance of satisfactory proof of interest and loss liability.

8. **STRIKES, RIOTS & CIVIL COMMOTION (S.R. & C.C.)**

Providing the Assured will not by the contract of affreightment or otherwise assume liability for loss or damage caused by or resulting from strikes, lockouts, labor disturbances, riots, civil commotion's or the acts of any persons taking part in any such occurrence or disorder, this insurance is extended to cover contingent liability of the Assured under common or statue law arising out of direct physical loss or damage to the aforesaid cargo caused be strikers, locked-out workman or persons taking part in labor disturbance, or riots or civil commotion as per the SR&CC endorsement attached to this policy.

9. **OTHER INSURANCE**

It is expressly agreed that this insurance shall not cover to the extent of any other valid and collectible insurance whether prior or subsequent hereto in date, and by whomsoever effected, directly or indirectly covering the same property, and/or liability, and the Assurer shall be liable for loss of damage only for the excess value beyond the amount of such other insurance. In the event of two or more of this policy's coverages apply to the same claim, the Assurer will not pay more than greater of the actual amount of the loss or the highest coverage limit applicable to the loss. Permission is granted the Assured to purchase coinsurance or excess insurance.

10. **REPORTS AND PAYMENTS OF PREMIUM**

On or before the 30th day following the anniversary of this policy, the Assured agrees to submit to the Assurer, or its Agent, a true report of their total gross receipts accrued during the policy period. If the total earned premium exceeds the above deposit, the Assured agrees to pay additional premium on the excess amount at the policy rate, such additional premium to become due and payable to the Assurer immediately upon the furnishing of the aforesaid report. In the event the earned premium falls short of the above estimate, the Assurer agrees to return premium, but no return premium shall become due or payable until the expiration date of the policy. It is further agreed that on each anniversary date there shall become due and payable to the Assurer a new deposit premium which shall be based on the estimated gross receipts for the ensuing year.

04/10/2009 11:07 AM 95613_50647

SEA 1073A 0606

11.  <u>INSPECTION OF RECORDS</u>

The Assurer shall have the privilege, at any time during business hours, to inspect the records of the Assured as respects shipments coming within the terms of this policy.

All other terms and conditions of this policy remain unchanged.

SEA 1143 0606

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## JOINT EXCESS LOSS COMMITTEE INFORMATION TECHNOLOGY HAZARDS CLAUSE

This endorsement modifies insurance provided under the following:

MARINE GENERAL LIABILITY COVERAGE PART
PROTECTION AND INDEMNITY FORM
EXCESS MARINE LIABILITY
HULL FORM
PIERS AND WHARVES COVERAGE
CONTRACTORS' EQUIPMENT COVERAGE
BOAT DEALER COVERAGE
MARINA OPERATOR'S LEGAL LIABILITY
CHARTERER'S LEGAL LIABILITY

Losses otherwise recoverable under this policy arising, directly or indirectly, out of:

i.     loss of, or damage to, or
ii.    a reduction or alteration in the functionality or operation of

a computer system, hardware, program, software, data, information repository, microchip, integrated circuit or similar device in or connected with computer equipment or non-computer equipment, whether the property of the insured or not,

shall not be aggregated.

If such losses are caused directly by one or more of the following physical perils, namely

theft of equipment, collision, sinking, grounding or stranding of carrying vessel, overturning or derailment of land conveyance, jettison or washing overboard, fire, lightning, explosion, aircraft or vehicle impact, falling objects, windstorm, hail, tornado, cyclone, hurricane, earthquake, volcano, tsunami, flood, freeze or weight of snow,

then this clause shall not prevent the aggregation of losses if otherwise permitted under the terms of this policy if they are caused by any such peril(s).

Joint Excess Loss Committee Information Technology Hazards Clause 11/16//01

SEA 1044 0606

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## DEPOSIT PREMIUM AND MINIMUM PREMIUM
## QUARTERLY REPORTING - QUARTERLY ADJUSTMENT

This endorsement modifies insurance provided under the following:

### OCEAN CARGO COVERAGE

**1. DEPOSIT:**

This policy is subject to the annual deposit premium(s) shown below, due and payable on the effective date of this endorsement and on each anniversary thereafter.

**2. QUARTERLY REPORTING – GROSS QUARTERLY VALUES SHIPPED:**

It is warranted by the Assured to report the gross **quarterly values shipped** (as per the Valuation Endorsement attached to this Ocean Cargo Policy) covered by this policy to this Assurer on or before the fifteenth (15th) day of the month following the last quarter. The Assured agrees to maintain complete and accurate records of shipments and at any reasonable request of the Assurer, surrender the bills of lading and any other pertinent shipping records to us for purposes the Assurer deems necessary.

**3. QUARTERLY ADJUSTMENT:**

Each quarter, the total premium developed at the policy rate(s) shall be applied to the deposit premium shown below and the difference shall be billed. In the event of cancellation of the Policy, the Assured shall immediately report the total insured shipments and other interest insured to the date of cancellation and a statement reconciling the deposit and billed shipments will be prepared by the Assurers subject to the minimum earned premium stated below.

**4. DEPOSIT PREMIUM:**

This policy is subject to a deposit premium as shown on the Declarations.

**5. MINIMUM EARNED PREMIUM:**

This policy is subject to a minimum earned premium as shown on the Declarations. The minimum earned premium is fully earned at inception and/or each anniversary thereafter unless otherwise agreed.

All other terms and conditions of the Ocean Cargo Policy and its endorsement(s) remain unchanged.

SEA 1044 0606                                                    Page 1 of 1

SEA 1052 0606

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## VALUATION
### STANDARD

This endorsement modifies insurance provided under the following:

**OCEAN CARGO COVERAGE**

Valued at amount of invoice, including all charges not included therein, including any prepaid and/or advanced and/or guaranteed freight plus <u>10%</u> until declared and then at amount declared, provided such declaration is made prior to any known or reported loss or accident, but in no event less than the foregoing.

Foreign currency is to be converted into U.S. currency at banker's sight rate of exchange applicable to each invoice and/or credit and/or draft.

All other terms and conditions of the Ocean Cargo Policy and its endorsement(s) remain unchanged.

SEA 1017 0606

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## ADDITIONAL CONDITIONS / WARRANTIES

**This endorsement modifies insurance provided under the following:**

**OCEAN CARGO COVERAGE**

In consideration of no change in premium it is understood and agreed that the following changes are hereby made to this policy:

**ALCOHOLIC BEVERAGES:**

It is hereby understood and agreed that effective from inception, and in consideration of additional premium to be developed at the rates shown in the Rate Schedule, this policy is extended to cover, including loss and/or deterioration caused by Freezing, shipments of Alcoholic Beverages, consisting primarily of Wines, shipped in insulated boxcars or intermodal containers.

However, in the event the insured interest is shipped in standard "dry van" type containers and/or trailers, it is warranted by the assured that the insured interest shall be protected by a thermal insulated blanket manufactured for the purpose in each container and/or trailer, and that the installation of the insulated thermal blanket is done in accordance with the manufacturers' recommendations.  Further, this Assurer shall not be liable under the terms of this endorsement for more than $250,000 per any one occurrence.

Additional premium rates for this coverage shall be:        SEE RATE SCHEDULE

The Assured agrees to keep an accurate record of all such shipments, and report monthly the total shipments by equipment type as delineated in the rate schedule, and pay additional premium, if any, immediately upon receipt of invoice.

**ELECTRIC CARS:**

Warranted electric cars to have exterior condition report at the time lased on railcars. Failure to have exterior condition report will void coverage.

All other terms and conditions of the Ocean Cargo Policy and its endorsement(s) remain unchanged.

SEA 1017A 0606

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## GENERAL PURPOSE ENDORSEMENT

This endorsement modifies insurance provided under the following:

**OCEAN CARGO COVERAGE**

In consideration of premium charged it is understood and agreed that the following changes are hereby made to this policy:

SEA1002 0606 Ocean Cargo Policy, 3) Loss Payee, is hereby amended to read as follows:

Loss, if any, payable to the Assured or Masonite International, Inc.

All other terms and conditions of the Ocean Cargo Policy and its endorsement(s) remain unchanged.

SEA 1017A 0606                                                                 Page 1 of 1

04/10/2009 11:07 AM 95613_50647

CCP 20 10 09 00

# SERVICE OF SUIT CLAUSE

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE PART
COMMERCIAL AUTO COVERAGE PART
COMMERCIAL CRIME COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
COMMERCIAL UMBRELLA LIABILITY COVERAGE PART
COMMERCIAL EXCESS LIABILITY COVERAGE PART

It is agreed that in the event of the failure by us to pay any amount claimed to be due hereunder, we will, at your request, submit to the jurisdiction of any court of competent jurisdiction within the United States of America and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court.

It is further agreed that service of process in such suit may be made upon the person or organization shown in the Policy Declarations or upon us at the address shown in the policy jacket.

And that in any suit instituted against any one of them upon this contract, we will abide by the final decision of such court or of any Appellate Court in the event of an appeal.

The above named are authorized and directed to accept service of process on behalf of us in any such suit and/or upon your request to give a written undertaking to you that we will enter a general appearance upon our behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory, or district of the United States of America, which makes provision therefore, we hereby designate the Superintendent, Commissioner, or Directors of Insurance or other officer specified for that purpose in the statute or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on your behalf or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the above named as the person to whom the said officer is authorized to mail such process or a true copy thereof.



CCP 20 10 09 00

SEA 1063 0606

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WAREHOUSEMAN'S LEGAL LIABILITY
# EXCLUDING ACTS OF GOD

This endorsement modifies insurance provided under the following:

## OCEAN CARGO COVERAGE

This policy is extended to cover the legal liability of the Assured as a warehouseman for physical loss or damage to lawful goods and/or merchandise accepted by the Assured for storage for which the Assured has issued a warehouse receipt from the time the Assured becomes responsible for said goods and/or merchandise until the Assured responsibility or liability ceases including while in the care, custody or control of the Assured in said warehouse(s) per the Assured's warehouse receipt.

It is agreed between the Assured and the Assurer that the Assured is taking upon themselves as to said goods and/or merchandise only the risks, perils and liabilities of a warehouseman imposed by law upon the Assured. Also to pay all legal expenses and costs incurred in defending claims founded or unfounded in respect of the insurance provided herein.

**1. LIMIT OF LIABILITY**

These Underwriters shall be liable, irrespective of values at risk, for no more than:

| Location | Limit |
|---|---|
| 3524 Business Center Drive, Chesapeake Virginia 23323 | $1,000,000.00 |
| 950 Vitality Drive, Comstock Park Michigan 49321 | $1,000,000.00 |

**2. DEDUCTIBLE**

From the amount of each claim recoverable hereunder the sum shown below shall be deducted:

$ 5,000.00

SEA 1063 0606

3. **EXCLUSIONS**

This policy does not cover:

A. Liability for loss of or damage to vehicles and/or containers and/or real property except to the extent such may be held for storage and/or consolidation by the Assured;

B. Liability for which a contractor or subcontractor is responsible and for which by special agreement the Assured shall have waived their rights of recovery unless such waiver is endorsed hereon and additional premium paid;

C. Liability for respect loss or damage to accounts, bills, currency, deeds, evidence of debt, securities, money, jewelry, watches, precious stones and similar valuables or any form of animal life or plant life, except with express written permission of the Assurer;

D. Liability arising out of the neglect of the Assured to use all reasonable means to save and preserve property for which the Assured may be liable;

E. Loss, damage or expense including legal costs incurred defending claim founded or unfounded under the deductible referenced above;

F. Liability for loss or damage caused by or resulting from misappropriation, secretion, conversion, infidelity or any dishonest act on the part of the Assured or of his employees or agents;

G. Liability for loss or damage caused by or resulting from voluntary parting, fraudulent scheme, trick, device or false pretense including but not limited to forged warehouseman's receipt and/or unauthorized instructions to transfer property to any person or any place;

H. Liability for loss or damage arising from loss of market and/or inherent vice, demurrage or other consequential loss;

I. Loss or damage to property owned, leased, or rented by the Assured;

J. Loss or damage to property covered or would have been covered under any warehouse and/or processors endorsement (if attached) of this policy;

K. Liability for loss or damage to property that was stored gratuitously, as an accommodation; is held as collateral or in trust;

L. Liability for loss or damage to refrigerated or other similar perishable goods except with written permission by the Assurer;

M. Liability for loss or damage caused by mysterious disappearance, unexplained loss or shortage upon taking inventory howsoever caused;

N. Loss of life or personal injury, howsoever caused;

O. Liability that would be covered by the terms and conditions of the standard Comprehensive General Liability Policy as promulgated by the Insurance Service Organization (ISO);

P. Liability assumed by the Assured under contract or otherwise in extension of the liability imposed upon the Assured by law in the absence of contract unless with the express written permission of the Assurer;

SEA 1063 0606

**Q.** Liability for loss or damage due to extremes in temperature, changes in atmospheric pressure, leakage, evaporation, shrinkage, loss of weight, loss of volume, rust, oxidation, corrosion, fungus, moths, insects, vermin, infestation, wear or tear, decay and deterioration; or

**R.** Liability for loss or damage caused by acts of God including but not limited to:

i) Surface water, waves, tidal water or tidal wave, overflow of streams or other bodies of water, or spray from any of the foregoing, all whether driven by wind or not

ii) Water which backs up through sewers or drains;

iii) Water below the surface of the ground including that which exerts pressure on or flows, seeps or leaks, through sidewalks, driveways, foundations, walls, basement or other floors, or through doors, windows or other openings in such sidewalks, driveways, foundations, walls or floors; unless loss by fire or explosion ensues and the Assurer shall then be liable only for such ensuing loss;

iv) Any earth movement such as an earthquake, mine subsidence, landslide, or earth sinking, rising or shifting, but the Assurers will pay for direct loss or damage caused by resulting fire or explosion if these perils are not otherwise excluded;

v) Volcanic eruption, explosion or effusion; however, the Assurer will pay for direct loss or damage caused by resulting fire or explosion if these perils are not otherwise excluded.

vi) Volcanic action means direct loss resulting from the eruption of a volcano when the loss is caused by:

a) Airborne volcanic blast or airborne shock waves;

b) Ash, dust or particulate matter or;

c) Lava Flow.

All volcanic action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss to the property insured;

vii) Windstorm or hail, regardless of any other peril insured against or otherwise; or

viii) Rain, snow, sand or dust, whether driven by wind or not, if that loss or damage would not have occurred but for the Windstorm or Hail.

SEA 1063 0606

### 3. CLAIMS AND CLAIMS PROCEDURES

In the event of any occurrence which may result in loss, damage and/or expense for which the Assurer may become liable under this insurance, notice thereof shall be given to the Assurer as soon as practicable and all documents relating to such occurrence shall be forwarded promptly to the Assurer or their designated agent, **AND THE ASSURED SHALL NOT ADMIT LIABILITY WITHOUT PRIOR WRITTEN CONSENT OF THE ASSURER.** Whenever required by the Assurer, the Assured shall cooperate with the Assurer (at the latter's expense) in all maters which the Assurer may deem necessary in the defense of any claim or suit or appeal from any judgment in respect of any occurrence as herein before provided. In cases where the liability of the Assured as aforesaid investigation and/or contested with the consent of the Assurer, this policy shall be liable for and will also pay in full, costs and expenses paid and incurred in investigation, contesting or settling liability. This insurance shall be void and of no force or effect, in respect of any accident or occurrence in the event the Assured interferes in any negotiations of the Assurers for settlement or in any legal proceeding in respect of any claim for which the Assurers are or may be liable under this insurance.

### 4. SUBROGATION

The Assurers shall be subrogated to all the rights which the Assured may have against any other person or entity, in respect of any claims of payment made under this policy to the extent of such payment, and the Assured shall upon the request of the Assurers, execute all documents necessary to secure to the Assurers such rights.

### 5. ACTION AGAINST THE ASSURER

No action shall lie against the Assurer unless the Assured shall have fully complied with all the terms and conditions of this policy, nor until the amount of the Assured's obligation to pay shall have been finally determined either by judgment against the Assured, the claimant and the Assurer, nor unless same shall be commenced within twelve (12) months the final judgment or decree is entered in the litigation against the Assured, or in case the claim against the Assurers accrues without the entry of twelve (12) months from the date of the payment of such claim; provided that where such limitation of time is prohibited by the laws of the State wherein this policy is issued, then no such suit or action shall be sustainable unless commenced within the shortest limitation of time permitted by the laws of such State.

No claim or demand against the Assurers under this policy shall be assigned to or transferred to a third party and additionally, no person, excepting a legally appointed receiver of the property of the Assured, shall acquire any rights against the Assurers by virtue of this insurance without the expressed consent of the Assurers.

### 6. LOSS PAYMENT

In the event of loss recoverable hereunder such loss is to be paid within thirty (30) days after presentation and acceptance of satisfactory proof of interest and loss liability.

SEA 1063 0606

7. **OTHER INSURANCE**

It is expressly agreed that this insurance shall not cover to the extent of any other valid and collectible insurance whether prior or subsequent hereto in date, and by whomsoever effected, directly or indirectly covering the same property, and/or liability, and the Assurer shall be liable for loss of damage only for the excess value beyond the amount of such other insurance. In the event of two or more of this policy's coverages apply to the same claim, the Assurer will not pay more than greater of the actual amount of the loss or the highest coverage limit applicable to the loss. Permission is granted the Assured to purchase coinsurance or excess insurance.

8. **REPORTS AND PAYMENTS OF PREMIUM**

The Assured agrees to keep an accurate record of all shipments accepted for carriage and to report to the Assurer as soon as practicable after each month number of containers, ad valorem declaration amounts and gross receipts. Premium shall be paid thereon as listed on the Rating Schedule.

9. **INSPECTION OF RECORDS**

The Assurer shall have the privilege, at any time during business hours, to inspect the records of the Assured as respects shipments coming within the terms of this policy.

10. **WAREHOUSE RECEIPTS**

The Assured agrees to place the issuing office of the Assurer on it's mailing list for any warehouse receipt changes and will keep this office supplied with up-to-date copies of warehouse receipts and other contracts with third parties.

All other terms and conditions of this policy remain unchanged.



**C**ORNERSTONE
S Y S T E M S

*Rock Solid Transportation Solutions*

July 16, 2008

Mr. Anthony Smith
WK Webster (Overseas) LTD
80 Maiden Lane, 12th Floor
New York, NY 10038

RE:          Our File          LD 2746

Anthony,

Attached you will find our claim for shortage of 10 pallets of Tequila totaling
$100,478.00.

I have attached all documents on file pertaining to our investigation. I will list below the
documents in the order presented in this file.  You may want to number these pages when
you get them as listed below.

Also I have listed contacts and phone numbers of people I have spoken with regarding
this shortage for your convenience and referral.

Jennifer Ross – Connecticut Distributors – 203-380-3098
Steve Silverman – Lexington Insurance (Dolle) – 617-543-6152
Eric - National Transportations Adjusters (assigned by Lexington) – 602-696-0237
Jack Hausner – ACME Claims Services (assigned by NTA) – 702-734-0775
Ken Klein- TTB – investigation at Patron - 206-553-1727 – Cell 202-306-9571
Matthew Lavier – TTB – Investigator assigned to visit Patron – 503-359-1026
Regina Dominguez – TTB – Investigator assigned to Connecticut Dist. – 860-594-8660
Lisa Rago - Patron - 702-262-9446

Jennifer Ross spoke with Patron and asked the questions I needed answered; however
phone number and contact is listed above for Patron.

P.O. Box 3010 • Kossuth, MS 38834
(662) 462-7593 • Fax (662) 462-7601
A Tennessee Corporation



The shipment was picked up in Las Vegas on April 16, 2008; unable to read signature of driver who picked up the load. I have contacted Connecticut Distributors and they have asked Patron if a gate log was kept where the driver printed his name; it was not; we have been unable to obtain the driver's name; Dolle Services is not cooperating in the investigation. The driver took the load back to California where another driver took the load from California to Connecticut. This driver, Raymond Hadnot, was stopped in Gallup, New Mexico by the DOT for inspection. You will find attached a copy of the report. When the DOT opened and inspected the trailer, he found only 18 pallets of tequila on the truck. The origin seal was intact. I have been unable to find out who sealed the trailer at Patron Spirits. My questions have been, "Did Patron give the seal to the driver to seal the load or did Patron seal the load?" No one has been able to answer this question. We know the origin seal was intact when the DOT in NM opened the trailer for inspection. The DOT counted only 18 pallets at this point and resealed the trailer. The driver then states his truck broke down in Texas causing a delay in delivery. The load delivered on April 25, 2008.

As you note, we gave the load to Dolle Services; the driver (?) who signed for the load indicated he drove for Dolle Services. The carrier name on the report indicated the trailer/driver was All Cargo Transport. Jon Ward, Cornerstone Systems, spoke to Dolle Services and they indicated they had bought the equipment from All Cargo Freight and they had not transferred the equipment with the DOT/FMCSA yet.

When it was discovered the product was missing and the inventory was not at Patron, shortly after April 25th, Jon Ward with Cornerstone Systems reported the incident to the TTB. This is how the TTB became involved.

These are just a few notes and if you have any other questions, let me know. I do know the customer is anxious for payment.

Thank you and feel free to contact me with any questions by email or phone at 888-414-0117 or 662-462-7593.

Sincerely,

Jan L. Haley
Cornerstone Systems, Inc.
Freight Claims Administrator



**MRC**
Investigations
1135 Wheaton Oaks Court
Wheaton, IL 60187-3051
Ph: (888) 293-7665
Fax: (630) 784-8445
24-hour: (630) 784-8441
Website: www.mrciusa.com
Agency License #117-001-086

# CONFIDENTIAL INVESTIGATIVE REPORT

## FIRST REPORT

| | |
|---|---|
| CLIENT: | W. K. WEBSTER |
| CLAIM NUMBER: | 10/08/11829 |
| INSURED: | CORNERSTONE SYSTEMS |
| DATE OF LOSS: | APRIL 16-18, 2008 |
| OUR FILE NUMBER: | MRC08-2076 |
| DATE OF REPORT: | SEPTEMBER 4, 2008 |



EXHIBIT
C



## EXECUTIVE SUMMARY:

On 4/16/2008, under Bill of Lading (BOL) #49551, dated 4/8/2008 (Attachment 1), 28 pallets containing 1,279 cases of tequila or spirits was shipped from the Patron Spirits Company, 6670 South Valley View Boulevard, Las Vegas, NV 89118. The driver checked out of Patron Spirits at 3:53 P.M., signing on behalf of carrier Dolle Services, and returned with the load to California rather than heading eastward for Connecticut. MRC Investigations (USA), Inc. was unable to contact anyone at Dolle Services, so we don't know where in California the load was taken. Apparently, they switched drivers and tractors.

Driver Raymond Hadnot left California with the load on 4/18/2008, and was stopped later that day at the Gallup, New Mexico DOT checkpoint for a vehicle and load check. New Mexico DPS Inspector Kenneth Homer, while checking the load inside the trailer, found only 18 pallets of spirits as compared to 28 pallets on the BOL (Attachment 2). Seal #PSC00463, noted as the original seal on the BOL, was still intact and was broken off for the inspection. Inspector Homer affixed a New Mexico Motor Transport Division seal #0000157 after the inspection, which was still intact when the remaining 18 pallets were delivered to consignee Connecticut Distributors.

Connecticut Distributors filed police report #08-14138 with the Stratford, CT Police Department on 6/10/2008 (Attachment 3). Connecticut Distributors also filed a claim against freight broker Cornerstone Systems, who had tendered the load to Dolle Services, for $100,478.00 (Attachment 4). Cornerstone Systems in turn filed a claim against Dolle Service and All Cargo Freight (allegedly owned by Dolle Service), through their insurance agent against Lexington Insurance Company (Attachment 5). Although the truck carrying the load was identified as All Cargo Freight, Cornerstone Systems was told verbally by Dolle Services that Dolle owned subsidiary All Cargo Freight, so it was not a separate business entity.

Cornerstone Systems had a Broker/Motor Carrier Agreement in effect with Dolle Service, Inc. (Attachment 6) and had obtained various due diligence documents regarding Dolle and All Cargo Freight (Attachment 7). Cornerstone also had a Commercial Lines Policy with Century Surety Company (Attachment 8). There is no contract or agreement between buyer Connecticut Distributors and broker Cornerstone Systems, although there is a long-standing business relationship between the two. Connecticut Distributors purchased the spirits from Patron Spirits under terms FOB shipper's dock, therefore owning the product when it was stolen and suffering the loss.

The only two opportunities for this loss to occur were to load only 18 pallets at Patron Spirits, or to remove 10 of the 28 pallets in California while in the care, custody and control of Dolle Service. If the latter, then the seal was not properly affixed at Patron Spirits since that same seal was still in place and undamaged when the truck arrived at the New Mexico DPS checkpoint. Regarding the former, at least two complete inventories were conducted without finding any additional (extra) product on hand, one by Patron and one by the Alcohol and

MRC08-2076
9/4/08

Page 2



Tobacco Tax and Trade Bureau (TTB). Patron Spirits reportedly "...is very strict about walking thru the loads with the drivers and making sure all is on the truck...", and cites that the driver signed for the whole load (Attachment 9).

Our investigator found that carrier Dolle Service, Inc., besides having their phone and fax lines disconnected, have an address that is only a convenience mailbox in a mailbox service store (located in a strip mall). They have not been seen at the mailbox service for about a month, and their mailbox is overflowing. There is no truck yard, terminal, or any actual business facility. All Cargo Freight, the supposed subsidiary of Dolle who picked up and carried the shipment, has an address that is a similar convenience mailbox in another location and its phone numbers are disconnected. This pattern of activity, including the mailbox addresses and the recent timing of their MC registration (April 2008), the fact that we can't find anyone to talk to, and apparently closing down operations after only a few months of business are all indicative of what police are calling "Russian Mafia" operations in the greater Los Angeles area.

MRC worked with the Los Angeles County Sheriff's Department Cargo Criminal Apprehension Team (Cargo CATs), the California Highway Patrol's Cargo Theft Interdiction Program (CTIP), and the Los Angeles Police Department's Burglary-Auto Theft Division, Commercial Auto Theft Section (BAD CATS) in disseminating the relevant product information which could be beneficial if it is determined the product had been stolen.

On 7/16/2008, MRC Investigations (USA), Inc. was requested to investigate this loss. The following is a report of our investigation.

## INVESTIGATION:

### Contact with Cornerstone Systems, Inc., 3250 Players Club Parkway, Memphis, TN 38125

Ms. Jan Haley (888-414-0117) stated that Cornerstone Systems works for Connecticut Distributors, and has for many years, without a contract or agreement. She further stated that Cornerstone brokered this load to Dolle Service, Inc., who sent an All Cargo Freight truck to carry the shipment. As noted in the Executive Summary above, All Cargo Freight is reportedly a wholly owned subsidiary of Dolle Service. Ms. Haley also provided a detailed summary of the case so far, and all of the written documents at Attachments 1-9.

### Contact with Patron Spirits Company, 6670 South Valley View Boulevard, Las Vegas, NV 89118

On August 1, 2008, after much delay, we were finally able to speak to Ms. Lisa Rago at Patron Spirits Company. The following is a summary of Ms. Rago's statement and she is identified as:

MRC08-2076
9/4/08

Page 3



Name:              Lisa Rago
Company:           Patron Spirits Company
Position:          Logistics Manager
Business address:  6670 Valley View Blvd., Las Vegas, NV 89118
Business phone:    702-262-9446

Rago stated the warehouse manager was responsible for setting up the load inside the warehouse before the driver arrived. He was responsible for checking the load to make sure the entire product ordered by the consignee was placed on 28 pallets and shrink wrapped.

According to Patron Spirits Company bill of lading #49551, the transportation was handled by Cornerstone Systems, Inc., a broker frequently used by the consignee. Rago stated the load was brokered to Dolle Service, Inc. and to her knowledge it was the first time they were used to pick up a load from them. The previous carrier transported a total of eight loads without incident, but Dolle Service was used because they were cheaper. Since the consignee has gone back to using the original carrier there have been no other problems. Rago stated that Patron Spirits Company only issued one bill of lading, #49551 and that covered the transportation from Patron Spirits Company in Las Vegas, to the consignee in Stratford, Connecticut. She added that she did not issue a short haul bill of lading but the driver was not limited to the route he was to take to Connecticut. When the Dolle Service, Inc. driver arrived the warehouse manager was responsible for doing a walk through with the driver to confirm all the pallets were present and the bill of lading reflects the load was checked with the driver as evidenced by the checkmarks. The driver then signed the bill of lading and the forklift driver loaded the pallets in the trailer.

Rago did not recall anyone mentioning any markings, license numbers, etc., on the trailer, which is not unusual since the only thing marked on the bill of lading is the trailer's equipment number which in this case was #85. The warehouse manager issued seal #463 and hand recorded the number on the bill of lading and placed his initials near the area indicating the trailer was loaded at door #7. Rago had no knowledge of the route the driver took once he left and only learned sometime later that he returned to California. She was unsure from whom she learned this fact. Rago declined to speculate as to why the load was short but after the shortage was reported to authorities, federal agents and company personnel checked the inventory and determined it was in balance.

Rago escorted us into the warehouse where she showed us exactly the procedures that are followed and how the product is pulled and staged for loading. She mentioned there were security cameras positioned throughout the warehouse and all of the dock doors were covered. When asked if the surveillance video for April 16th had been reviewed by anyone she claimed the video is only kept for seven days and then it is taped over. By the time this shortage was discovered and reported the tape was being reused. (*It should be noted that Hausner had been told the cameras were down on the day the missing product was loaded.*) Rago had no additional information with regard to the shortage and was at a loss to explain how the seal could have been opened without breaking it.



**Investigations**

On August 4, 2008, we received an email from the Warehouse Manager, Mr. Paul Fisher, who was responsible for setting up the load and the forklift driver, Mr. Mike Guerrero. In the email they described their loading procedures as follows:

    (1) The load is checked prior to the arrival of the carrier.
    (2) On arrival, the driver is assigned a door to back up to.
    (3) The driver physically counts the load with the forklift driver.
    (4) The forklift driver loads the trailer. The driver may observe or not at his discretion.
    (5) Once the trailer is loaded, the driver signs the bill of lading and is instructed to pull forward and close the trailer doors, after which the forklift driver installs the seal.

### Contact with Dolle Service, Inc., 15981 Yarnell Street #215, Sylmar, CA 91342

MRC's investigator found that carrier Dolle Service, Inc., besides having their phone and fax lines disconnected, has an address that is only a convenience mailbox in a mailbox service store (located in a strip mall). They have not been seen at the mailbox service for over a month, and their mailbox is overflowing. There is no truck yard, terminal, or any actual business facility. All Cargo Freight, the supposed subsidiary of Dolle who picked up and carried the shipment, has an address that is a similar convenience mailbox in another location, and its phone lines are also disconnected. This pattern of activity, including the mailbox addresses and the recent timing of their Motor Carrier registration (April 2008), the fact that we can't find anyone to talk to, and apparently closing down operations after only 4 months of business are all indicative of what are being called "Russian Mafia" operations in the greater Los Angeles area. Attempts to contact either Dolle or All Cargo through their insurance agent, Bargain Auto Insurance Agency, 14762 Bellflower Boulevard, Bellflower, CA 90706 revealed that he had cancelled their coverage because they would not respond to him and he did not know how to get in touch with either company.

### Interview of Jack Hausner – Insurance Adjuster for Lexington Insurance Co.

On July 28, 2008, we spoke to Mr. Jack Hausner on the telephone. The following is a summary of Mr. Hausner's statement and he is identified as:

    Name:                Jack Hausner
    Company:           Acme Claims Service
    Position:             Insurance Adjuster
    Business address: 4107 W. Cheyenne Ave., Las Vegas, NV 89032
    Business phone: 702-734-0775

Hausner states he is an insurance adjuster for Lexington Insurance that insured Dolle Service, Inc. He contacted Ms. Lisa Rago and Chuck (last name unknown), at Patron Spirits regarding the 10 missing pallets of tequila. He was provided a copy of the bill of lading #49551 by Rago which was unreadable and it appeared the driver's signature that picked up the tequila only used his initials. When Hausner asked Rago for the manifest shipping form which would



reflect the number of pallets loaded on the trailer, the names of the company personnel who loaded the pallets, and who placed the seal on the trailer after it was loaded, she left the room for a short time and then returned accompanied by the company's Chief Financial Officer, Mr. David Lawrence. Lawrence informed Hausner that he did not like the idea of him accusing one of their employees of theft and ordered him to leave the premises. Before leaving, Hausner was able to secure from Rago a sample of the seal they used to seal the trailers after loading which he noted was a metal seal that once fastened on the door could not have been removed without breaking or cutting it.

Hausner determined the tractor and trailer used to pick up the load belonged to All Cargo Freight, which may or may not have been purchased by Dolle Services, Inc. He also determined the driver returned to Sylmar, California where they switched the tractor to one owned by Dolle Service, Inc. before continuing on to Connecticut. The load arrived late in Connecticut and the driver did not indicate he broke down or provide any credible reason for the load being delivered late.

Hausner attempted to determine from Rago if they made a copy of the driver's license of the driver who picked up the load or who the foreman and forklift driver was at the time of loading but none of the information was provided to him. Rago told Hausner that although they have cameras located throughout the warehouse and loading area at the time this particular trailer was loaded, they were all down and in the process of being reconfigured.

Hausner attempted to contact Dolle Service, Inc. but the person answering the phone told him he would have to discuss the matter with Dolle's General Manager, Mr. David Lasko, who only came in to work three days a week. Hausner attempted to call Lasko many times on the days he was reportedly at work but he never received a return call. Hausner sent a certified letter to Lasko in care of Dolle Service, Inc. to notify Lasko that if he did not respond by the end of June, he, Hausner, would have to notify their insurance broker. By the end of June, Hausner still had not heard from Dolle Services, Inc., so he sent a second certified letter to inform them that if he did not receive a reply within 30 days of the letter, all insurance coverage for Dolle Services, Inc. would be dropped and the claim regarding the missing tequila would not be settled. Hausner never received a response from Dolle Services, Inc.

Hausner said the seal utilized by Patron Spirits to seal the trailer was #00463 which was subsequently cut off by the New Mexico State Police when the driver was stopped near Gallup. This seal was left inside the trailer by DOT personnel when they resealed the trailer with seal #009746 and both seals were recovered when the trailer was off loaded by the consignee.

Hausner was contacted by ATF Special Agent Dominguez in New York concerning this matter and ATF Special Agent Matthew Lazier from Cloverdale, Oregon came to Hausner's office and obtained a copy of his file on this case. Hausner added that to the best of his knowledge the shortage has never been reported to the FBI and Dolle Service, Inc. has not made a claim against any of the insurance companies. He feels that unless reported by one of the companies involved none of the insurance companies are responsible to settle the claim. He also feels that



since the consignee owned the shipment it is their responsibility to report the shortage to the FBI since it exceeds $10,000.

Since Dolle Service, Inc. has not provided Hausner with any information regarding their driver, Raymond Hadnot, or the unknown driver that picked up the load in Las Vegas, he has been unable to interview or obtain background information concerning either.

On July 30, 2008, we drove to All Cargo Freight, Inc. and discovered that their business address, 8209 #A-259 Foothill Blvd. in Sunland, California was no more than a mail drop at a business called "USA Mail Box Rental." (Attachment 10) The employee on duty would not provide any information regarding All Cargo Freight, Inc. but said we could write them a note and he would put it in their box.

On July 30, 2008, we drove to Dolle Service, Inc. and discovered that their business address of 15981 Yarnell St. #215 in Sylmar, California was only a mail drop at a business called "The Mail Room." (Attachment 11) We contacted one of the owners of The Mail Room, Ms. Radisha Brown, who said she has not seen anyone from Dolle Service, Inc. pick up their mail in over a month and their box is completely full but she continues to put their mail in a box on the floor. She added that a man from the business directly south of The Mail Room, which she believes is a credit repair business, reported to her that he received an anonymous call from a person accusing The Mail Room of being involved with Dolle Service, Inc. in fraudulent activities. Brown denies any involvement with Dolle Service, Inc., other than renting them a mail box just like the post office, Mail Boxes Etc. or The UPS Store would do. Brown checked their records for additional information or contacts for Dolle Service, Inc. with negative results.

We attempted to contact someone at the business immediately south of The Mail Room which had no signage indicating a business name but the door was locked and nobody responded to our knock. We left a business card with a note asking anyone associated with the business to call us.

### Additional Investigation

We conducted a search through the Federal Motor Carrier Safety Administration (FMCSA) and discovered All Cargo Freight, Inc., *dba* Cargo Intransit, was assigned U.S. D.O.T. #1456037 and MC #550146; however, there were no additional contact numbers or addresses listed for them. We conducted a similar search for Dolle Service, Inc. and discovered they were assigned U.S. D.O.T. #1638166 and MC #603710 but there were no additional contact numbers or addresses for them.

We conducted a California Corporation search on All Cargo Freight, Inc. which revealed they held active Corporation #C2699050 with a filing date of February 11, 2005. Their corporate address was listed as 9741 Wheatland Ave. #1, Shadow, California 91040 and their Agent for Service of Process was listed as Allen Avetyan at the same address. We conducted a similar



search on Dolle Service, Inc. which revealed they held active Corporation #C3090424 with a filing date of March 5, 2008. Their corporate address was listed as 15981 Yarnell St., Suite 125, Sylmar, California 91342 and their Agent for Service of Process was listed as Corporation Service Company, *dba* CSC-Lawyers, Incorporating Service, 2730 Gateway Oaks Dr., Suite 100, Sacramento, California 95833.

We conducted a criminal search in name only on Lisa Rago, Paul Fisher, Mike Guerrero and Raymond Hadnot. References were found for Hadnot and Fisher but without additional identifying information it is impossible to determine if they are the same individuals associated with this case.

We contacted Bargain Insurance Agency, the insurance broker for Dolle Service, Inc. at 562-920-9116 and spoke to Jessica in Customer Service. She said all of the phone numbers they have for Dolle Service, Inc. have been disconnected and they are no longer one of their clients.

We were contacted by another trucking company who informed us they were the victim of a similar incident involving Dolle Service, Inc. within the past six months.

**END OF REPORT**

Respectfully submitted,

*Gary W Verseput*

Gary W. Verseput, Senior Investigator
MRC Investigations USA

**ATTACHMENTS:**
1.  Bill of Lading #49551, dated 4/8/2008
2.  Driver/Vehicle Examination Report from New Mexico DPS, dated 4/18/2008
3.  Stratford, CT Police Report #08-14138, dated 6/10/2008
4.  Loss and Damage Claim against Cornerstone Systems, by Connecticut Distributors
5.  Claim notification by Cornerstone Systems, against Dolle Service & All Cargo Freight
6.  Broker/Motor Carrier Agreement between Cornerstone Systems and Dolle Service
7.  Dolle Service due diligence documents
8.  Century Surety Company Commercial Policy #CCP542652 on Cornerstone Systems
9.  Copy of e-mail from Lisa Rago @ Patron Spirits re. loading procedures
10. Picture of All Cargo Freight business address -- a mail drop
11. Picture of Dolle Service business address -- a mail drop

MRC08-2076
9/4/08





**MRC**
**Attachment #1**

2.  The latching and locking mechanism on the doors of the trailer may have been removed or bypassed
    without removing the original seal, and then replaced after taking out the 10 pallets of missing tequila.
    Since the trailer was long gone before this case was opened, and we have not been able to find either
    Dolle Service or All Cargo Freight companies, we had no way to inspect the trailer.

I am returning the actual physical seals to Cornerstone Systems, who will hold them in their files.
If there are additional questions, or you desire additional investigation, please contact me.
Thank you,
Gary V.

Gary W. Verseput, Senior Investigator
MRC Investigations (USA), Inc.
1135 Wheaton Oaks Court
Wheaton, Illinois 60187
gary.verseput@mrciusa.com
Phone: 630-784-0311
Cell: 630-270-5261
Fax: 630-784-8445

This email has been scanned by the MessageLabs Email Security System.

09/11/2008

Message                                                                 Page 1 of 2

---

### Eileen Flood

| | |
|---|---|
| **From:** | James R. Ohlfest |
| **Sent:** | Thursday, September 11, 2008 3:01 PM |
| **To:** | Eileen Flood |
| **Subject:** | FW: 01-56676 Cornerstone Systems, Inc. Y/F 10/08/11829 |

IR

---

**From:** Stuart Shillibeer [mailto:sshillibeer@wkwebsteroverseas.com]
**Sent:** Thursday, September 11, 2008 12:50 PM
**To:** James R. Ohlfest
**Subject:** FW: 01-56676 Cornerstone Systems, Inc. Y/F 10/08/11829

# W K Webster (Overseas) Ltd

80 Maiden Lane, 12th Floor
New York, NY 10038, USA
T: +1 212 269 8220
F: +1 212 363 9726
www.wkwebster.com

Hi Jim,

Please see advice below from investigator Gary Verseput.

Best regards

**Stuart Shillibeer**
Director
For and on behalf of W K Webster (Overseas) Ltd
As agents only

Mobile / Cell   +1 917 837 2217
Email:      sshillibeer@wkwebsteroverseas.com

*With US Offices in New York and California*

-----Original Message-----
**From:** Gary Verseput [mailto:gary.verseput@mrclusa.com]
**Sent:** 11 September, 2008 3:31 PM
**To:** Stuart Shillibeer
**Subject:** RE: 01-56676 Cornerstone Systems, Inc. Y/F 10/08/11829

9/11/2008 – I have this day physically inspected both seals associated with this load: the original metal seal #PSC00463 (manufactured by Tyden) that was removed by the New Mexico State Police, and the New Mexico Motor Transport Division seal #0000157 (manufactured by Stoffel) that was placed on the trailer by them after their inspection. Other than the obvious breaks to remove each seal, there is no other sign of tampering or bypassing either seal's integrity.  That leaves two possibilities:
1.  The original seal was not securely fastened when first applied at Patron Spirits in Las Vegas, so that it looked secure but could still be pulled apart without damage.

09/11/2008

04/16/2009   PHOT-RM-08013_0001T



File number# MRC08-2076

Claim #10/08/11829
Assured: Cornerstone Systems, Inc.



Dolle Service, Inc. business address, 15981 Yarnell St. #215 in Sylmar, California, a mail
drop at a business called "The Mail Room"



File number# MRC08-2076
Claim #10/08/11829
Assured: Cornerstone Systems, Inc.



All Cargo Freight, Inc. business address, 8209 #A-259 Foothill Blvd. Sunland, California, a mail drop at a business called "USA Mail Box Rental"



**MRC**
Investigations

1135 Wheaton Oaks Court
Wheaton, IL 60187-3051
Ph: (888) 293-7665
Fax: (630) 784-8445
24-hour: (630) 784-8441
Website: www.mrciusa.com
Agency License #117-001-086

September 4, 2008

Mr. Stuart Shillibeer
W.K. Webster
30 Maiden Lane, 12th Floor
New York, New York 10038

Re. Claim #10/08/11829 Cornerstone Systems, Inc. MRC08-2076

Dear Mr. Shillibeer —

In addition to the factual information provided in our First Report, the following is our analysis
of this case.

**ANALYSIS:**

The only two possible causes for this loss were that the cargo was short loaded at Patron Spirits
in Las Vegas, or that the seal was not properly affixed there allowing 10 pallets of cargo to be
removed in somewhere in California between April 16 and 18. Two inventories, one by Patron
Spirits and one by the U.S. Alcohol Trade and Tax Bureau (TTB), found no extra product at
Patron. On the other hand, carrier Dolle Service/All Cargo Freight appears to have been set up
just days before this theft, and has since disappeared completely with telephones disconnected
and mail box drops unused. It does appear that Cornerstone Systems attempted to do their due
diligence regarding Dolle, but was perhaps fooled by false paperwork. Local police in the Los
Angeles are characterizing this trucking theft operation as typical of the "Russian Mafia" in that
area.

If you have any questions about this First Report, or desire additional investigation, please feel
free to contact me directly.

Thank you for your business, and your patience.

Best regards,

*Gary W. Verseput*

Gary W. Verseput
Senior Investigator

Enclosures

04/10/2009 11:08 AM 95613_50647

## CORNERSTONE
S Y S T E M S
*Rock Solid Transportation Solutions*

# Loss and Damage Claim

**Company:** Connecticut Distribution **53**

**Claimant Claim ID:** LD0000002746

**Presentation Date:** 04/30/2008

**Claim is hereby filed with the below carrier for:**

Pilferage And Shortage

**in connection with the shipment described below:**

**Carrier**

Cornerstone Systems
**Address:** PO Box 8010  FAX 662-510-0558
email:  jhaley@cornerstone-systems.com
Kossuth, MS 38834

**Contact:** Jan Haley          **Phone:** 662-462-7593

**Freight Bill (Pro) Number:** _____   **Shipment:** 04/16/2008   **Delivery Date:** 04/25/2008

**Bill To**
Cornerstone Systems - Insurance
Century % WK Webster
80 Maiden Lane - 12th Floor
New York, NY 10038

**Carrier Claim ID:**
**Carrier Bill-of-Lading:** MI01 013530
**Carrier BOL Date:** 04/16/2008
**Vehicle Number:**

**Shipper**
Patron Spirits
6670 South Valley View

Las Vegas, NV 89118

**Point Shipped From:**
**Customer:** Connecticut Distribution
**Destination:** 333 Lordship Blvd

Stratford, CT 06497

| Product ID | Product Description | Quantity | Price | Disposition | Weight | Release | Line Total |
|---|---|---|---|---|---|---|---|
| TEQUILA | Tequila | 35 | 352.0000 | 100 | 0.0000 | 0.00 | 12,320.0000 |
| TEQUILA | Tequila | 175 | 294.0000 | 100 | 0.0000 | 0.00 | 51,450.0000 |
| TEQUILA | Tequila | 140 | 135.0000 | 100 | 0.0000 | 0.00 | 18,900.0000 |
| TEQUILA | Tequila | 112 | 159.0000 | 100 | 0.0000 | 0.00 | 17,808.0000 |

| | |
|---|---|
| Discount (-) | $0.00 |
| Freight Charges (+) | $0.00 |
| Misc Charges (+) | $0.00 |

*Currency shown in US DOLLAR (USD)*

**Total Claim Amount:** $100,478.00 USD

| Document | Value | Last Update | File Stored |
|---|---|---|---|
| Invoice Document | 27954 | 04/16/2008 | ☐ |
| Purchase Order Form | 49551 | 04/08/2008 | ☐ |
| Other Document | New Mexico DOT Report | 04/16/2008 | ☐ |
| Seal Number | copies of seals | 04/25/2008 | ☐ |
| Customer Claim Number | 49551 | 04/28/2008 | ☐ |
| Delivery Receipt Document | Receiving Document | 04/25/2008 | ☐ |
| Delivery Receipt Document | Copy of BL | 04/16/2008 | ☐ |


EXHIBIT
D



# Loss and Damage Claim

**Company:**   Connecticut Distribution **53**

Claimant Claim ID:   LD0000002746

**Presentation Date:**   04/30/2008

REMIT CLAIM PAYMENT TO:

CORNERSTONE SYSTEMS, INC.
ATTN: PAULETTE SNEEL
5101 WHEELIS DRIVE, SUITE 300
MEMPHIS, TN  38117

REFER TO OUR CLAIM# ON REMITTANCE

Note: The absence of any document called for in connection with this claim must be explained. When impossible for claimant to produce original bill of lading, or paid freight bill, a bond of indemnity must be given to protect carrier against duplicate claim supported by original documents.

**Preparer's Name:**    Jan Haley
**Claims Administrator**

Signature: _____

Date  7/31/08      Check Number      677271

***100,478.00

ONE HUNDRED FOUR HUNDRED SEVENTY EIGHT & 00/100 DOLLARS

CONNECTICUT DISTRIBUTORS, INC.
ATTN: JENNIFER ROSS
393 LORDSHIP BLVD.
STRATFORD, CT  06615

*** CHECK COPY ***

LD2746/49551   100478.00


EXHIBIT
E

## CORNERSTONE SYSTEMS, INC.

### CHECK REQUEST FORM

| | | | |
|---|---|---|---|
| Check Number: | _____ | Date Requested: | 07/28/08 |
| Payee: | Connecticut Distributors, Inc. | Date Needed: | Next check run |
| Address: | Attn: Jennifer Ross | Amount: | $100,478.00 |
| | 333 Lordship Blvd. | Telephone #: | |
| | Stratford, CT 06615 | I.D. 2746  MI01013530 | |
| | ref. 49551 | | |

*Taxpayer Identification Number of Payee, if not a Corporation:* _____

☐ Return to: _____    ☑ FED EX: _____

☐ U.S. Mail _____    ☐ OTHER    ☐ ONWARD

Description:  Freight claim settlement  OK to pay per Tim Clay.  Claim filed with insurance company

Requested By:  Jan L. Haley    Approved By:  WEC
    Approval Date:  7/28/08

### FOR ACCOUNTING USE ONLY

| | | | |
|---|---|---|---|
| G/L ACCOUNT NAME: | _____ | G/L ACCOUNTING NUMBER: | 1-2000-3 |
| G/L ACCOUNT NAME: | _____ | G/L ACCOUNTING NUMBER: | _____ |
| G/L ACCOUNT NAME: | _____ | G/L ACCOUNTING NUMBER: | _____ |



## CORNERSTONE
S Y S T E M S

*Rock Solid Transportation Solutions* ®

### ASSIGNMENT and RELEASE

In consideration of One hundred thousand four hundred seventy-eight and 00/100 Dollars ($100,478.00) and other good and valuable consideration paid by Cornerstone Systems, Inc. to Connecticut Distributors (Customer), the receipt and sufficiency of which are hereby acknowledged, Connecticut Distributors does hereby:

A. Assign to Cornerstone Systems, Inc. (Property broker) all of its right, title and interest to any property and cargo damage claims, as well as any personal injury claims arising out of the shipment identified in the document(s) dated, April 16, 2008 and attached bill of lading against Patron Spirits, (shipper), 6670 S Valley View Blvd, Las Vegas, NV 89118.

B. Release and forever discharge Cornerstone Systems, Inc, its successors in interest, directors, officers, shareholders, agents and representatives from all property damage, cargo damage and personal injury claims of any kind arising out of the shipment described above,

C. Agrees to provide its full cooperation to Cornerstone, its attorney or its insurers to collect any property damage, cargo damage or personal injury damages from Dolle Services and their insurers.

_Cornerstone Systems_
(Shipper)

By: _Chad Stone_
Its: _SVP FINANCE /CFO_

IN WITNESS WHEREOF, _Chad Stone_ (consignee, officer), has executed this instrument by its (title) _CFO_ this _28_ day of _July_, 2008, who acknowledged himself to be the _SVP Finance /CFO_ of said company and who represented that he is expressly authorized to execute this Assignment on behalf of the company.

Subscribed and sworn to before me
this _28_ day of _July_, 20 _08_.

F A X E D

JUL 2 8 2008

Notary Public _Mary Padgett_
MY COMMISSION EXPIRES 8/31/2010

3250 Players Club Parkway, Memphis, TN 38120
(901) 842-0660 · Fax (901) 328-6320
A Tennessee Corporation



EXHIBIT
F

04/10/2009 11:08 AM 95613_50647



**CENTURY**®
Insurance Group

Century Surety Company I ProCentury Insurance Company.

James R. Ohlfest
Claims Representative
(602) 216-6566 | johlfest@centurysurety.com
(800) 854-8045

November 7, 2008

<u>VIA CERTIFIED and REGULAR MAIL</u>
7112 3456 5220 2001 3598

Cornerstone Systems, Inc.
5101 Wheelis Drive, Suite 300
Memphis, TN 38117

RE:    Claim No.:       01-056676
       Policy No.:      CCP469452
       Insured:         Cornerstone Systems, Inc.
       Date of Loss:    Between April 16-18, 2008
       Type of Loss:    Partial Pilferage of Cargo

Dear Insured:

On September 10, 2008, Century Surety Company notified you that it was in receipt of your indemnity claim for funds reportedly paid to Connecticut Distributors for partial theft/disappearance of a load of tequila. In the correspondence, Century Surety Company further notified you that it had reason to believe your claim may be excluded from coverage under Exclusion K and Exclusion L of your policy and that it may deny coverage under those exclusions. Unfortunately, after giving this matter due consideration, Century Surety Company has concluded that the loss for which you seek indemnity is not covered under your policy.

Further, while we do not yet have enough information to determine whether certain other exclusions are applicable, we would like to take this opportunity to point out that Exclusion J and Exclusion M may also apply to preclude coverage. Accordingly, any further investigation into this matter is under a full and complete reservation of Century Surety Company's right to deny coverage for this claim under Exclusion J and Exclusion M.

FACTS

We understand the pertinent facts to be as follows. A company known as Connecticut Distributors ("CD") purchased 28 pallets of tequila from Patron Spirits Company ("Patron"), which is located in Las Vegas, Nevada. CD hired Cornerstone Systems, Inc. ("Cornerstone") to broker shipment of the tequila from Nevada to Connecticut. Cornerstone brokered the shipment to a carrier known as Dolle Service, Inc. ("Dolle"). Dolle, who in turn, hired a trucking concern called All Cargo Freight ("ACF"), a subsidiary of Dolle, to transport the shipment.

After leaving Patron in Las Vegas, for an unknown reason, the truck containing the tequila traveled to Los Angeles, California, and not to Connecticut. In Los Angeles, ACF hooked a replacement truck to the trailer and headed east. We believe the facts indicate that the 10 pallets of tequila were stolen during the trip from Las Vegas to Connecticut, while the cargo was being transported on behalf of your company.

While traveling through New Mexico, the truck was stopped by DPS for a moving violation. During the stop, the DPS officer conducted an inventory of the load with the bill of lading and discovered that the truck was missing 10 pallets of tequila. A report from the DPS officer

www.CenturySurety.com

4722 N. 24ᵗʰ St., Suite 200, Phoenix, AZ 85016    Phone: (800) 854-8045    Fax: (602) 371-0113
**MAILING ADDRESS: P.O. Box 163340, Columbus, OH 43216-3340**


EXHIBIT
6

Cornerstone Systems, Inc.
November 7, 2008
Page 2 of 4

indicates that the original seal on the back door of the trailer was intact and matched the seal number listed on the bill of lading. There were no signs of tampering or bypassing the seal's integrity, other than the break caused by the DPS officer in order to inspect the cargo. It is our understanding that both Patron and the Alcohol and Tobacco Tax and Trade Bureau conducted two separate inventory checks at Patron in Las Vegas and concluded that Patron did not have a surplus inventory. It is also our understanding that both Dole and ACF have disconnected their phone lines and cannot otherwise be located.

Cornerstone has reimbursed CD the cost of the missing 10 pallets of tequila. You have made a claim for the cost of the 10 pallets under your policy. If we are incorrect in our understanding of the facts, please let us know.

## POLICY PROVISIONS

Your claim is made under Domestic Intermediary Contingent Liability Endorsement ("Endorsement") to the Policy. Section 3 of the Endorsement states:

### 3. EXCLUSIONS

This policy does not cover:

J. Liability for loss or damage arising from infidelity, conversion, secretion, misappropriation or other dishonest act on the part of the Assured, his agents, and/or employees, and/or others to whom the property has been entrusted, carriers for hire excepted;

K. Liability for loss or damage arising from pilferage from shipper's load and count containers and/or conveyances, unless original seal shows evidence of tampering;

L. Liability for loss or damage arising from unexplained loss, mysterious disappearance, and/or shortage upon taking inventory;

M. Liability for loss or damage arising from the neglect of the Assured to use all reasonable means to save and/or preserve the property of interest at the time of or subsequent to any occurrence giving rise to loss and/or damage;

## DISCUSSION

Century Surety Company believes this loss is excluded under Exclusion K and Exclusion L of the Endorsement. Century Surety Company further believes that, upon further investigation, this loss may be excluded under Exclusion J and Exclusion M of the Endorsement.

### 1. Exclusion K

Exclusion K excludes from coverage "[l]iability for loss or damage arising from pilferage from shipper's load and count containers and/or conveyances, unless original seal shows evidence of tampering." As two separate inventory checks conducted at Patron in Las Vegas have revealed no surplus of inventory, it is clear that the missing pallets of tequila were in fact loaded on ACF's truck. There is no suggestion that the tequila was destroyed or removed by authorized personnel. Coupled with the fact that the truck made an unauthorized stop to Los Angeles and

Cornerstone Systems, Inc.
November 7, 2008
Page 3 of 4

the fact that neither Dole nor ACF can be located, Century believes the evidence demonstrates that the 10 pallets of tequila were stolen or pilfered from the truck.

The evidence also shows that the original seal was intact at the time the DPS officer opened the trailer, and there is no other evidence that the seal was tampered with or breached until this time. As a result, Century Surety Company believes that your claim for the loss of the tequila is excluded under Exclusion K.

    2.    <u>Exclusion L.</u>

Exclusion L excludes from coverage "[l]iability for loss or damage arising from unexplained loss, mysterious disappearance, and/or shortage upon taking inventory." Exclusions such as Exclusion L have consistently been held to exclude coverage for losses for which there are no reasonable explanation, but which were discovered upon the taking of an inventory. We understand that the driver for ACF pleaded complete ignorance as to the causes or origin of the loss of the tequila. Thus, even if the evidence did not establish that the tequila was stolen, which we believe it does, there would be no other reasonable explanation for the shortage of cargo.

Because the shortage was discovered when the DPS officer compared the count of tequila on the truck to the amount on the bill of lading, the shortage was discovered upon the taking of an inventory. Thus, Century Surety Company believes that your claim for the loss of the tequila is excluded under Exclusion L.

The reasons stated for our denial of coverage under Exclusion K and Exclusion L should not be considered as being all inclusive, and Century Surety Company reserves the right to raise other defenses to coverage that may be applicable. If you believe we have misunderstood the factual basis for the claim, or have overlooked any pertinent portion of the policy, please let us know.

    3.    <u>Exclusion J and Exclusion M.</u>

While we do not yet have enough information to determine whether certain other exclusions are applicable, we believe that Exclusion J and Exclusion M may also apply to preclude coverage. It is our understanding that your company hired Dole to transport the tequila from Las Vegas, Nevada to Connecticut and that Dole hired ACF to transport the cargo. Because the evidence demonstrates that the 10 pallets of tequila were stolen while the cargo was being transported on behalf of your company, we believe that, upon further investigation, both Exclusion J and Exclusion M may exclude coverage for your loss.

Accordingly, any further investigation into this matter is under a full and complete reservation of Century Surety Company's right to deny coverage for this claim under Exclusion J and Exclusion M. Please be advised that, under the terms and conditions of your policy, you are required to cooperate in the investigation, documentation, and support of your claim. Further, neither this letter nor our investigation of this matter are to be construed as a waiver of any rights or defenses now or hereafter available to Century Surety Company, nor as a waiver of any other person's (including any insured's) obligations under any insurance afforded by Century Surety Company. Please continue to cooperate with the investigation being completed by Mr. Shillibeer of W K Webster Overseas, Ltd., or any representatives they retain.

04/10/2009 11:08 AM 95613_50647

Cornerstone Systems, Inc.
November 7, 2008
Page 4 of 4

If upon receipt of this correspondence you have additional questions or concerns, please feel free to contact Mr. Shillibeer or the undersigned at (800) 654-8045.

Sincerely,

CENTURY SURETY COMPANY

James R. Ohlfest
Claims Representative

JRO/jt

cc:    Vista Insurance Partners of IL
       6 W. Hubbard Street, 4th Floor
       Chicago, IL 60610

       Stuart Shillibeer
       W K Webster (Overseas) Ltd
       80 Maiden Lane, 12th Floor
       New York, NY 10038



USI of Tennessee, Inc.
5100 Poplar Avenue
Suite 1200
Memphis, TN 38137
www.usi.biz
Phone:    901.766.5990

Mr. James R. Ohlfest
Claims Representative
**CENTURY SURETY COMPANY**
4722 N. 24th Street
Suite 200
Phoenix, Arizona   85016


RE: **POLICY NO. CCP 469452**
      **Your File No. 01-056676**
      **Pilferage Claim**


Dear Mr. Ohlfest:

We are now finally in receipt of the actual formal report, supporting documentation, and supplementary correspondence on this loss. With this perspective in hand, we would make the following comments to address your reservation of rights letter dated November 7, 2008.

1) You stated that you believed Exclusion K is operable.  We would argue against this conclusion for the following reasons:
    a. This was a shipper load but carrier count load, not shipper load and count. The exclusion was designed to address the situation where a driver of a power unit picks up a complete trailer/container which has been loaded and sealed by the shipper prior to his arrival, and as the carrier's representative he has not had an opportunity to verify the contents.  In this particular shipment, the carrier was given the opportunity to count the cargo prior to load, and did so, signing for it.
    b. The purpose of this exclusion of course is to eliminate "paper losses" which result as a function of short-shipping.  It appears that all parties involved have a firm belief that the property is missing as a result of theft, most likely directly by the carrier given the circumstances.  Subsequent independent inventories by both the shipper and the U.S. Alcohol Trade and Tax Bureau confirm the property short had not been left behind in the origin terminal.

Accordingly, we do not believe the loss is excluded within the intent of this exclusion.



**EXHIBIT**
**H**

2) You stated that you believed Exclusion L is operable. We would argue against this for the following reasons:
   a. This exclusion is designed specifically for location coverage, i.e. warehousing. The loss in question occurred during transit and therefore mysterious disappearance does not come into play. To characterize that the DPS officer's count of the cargo constitutes an "inventory" is simply not correct.
   b. As above, the intent of this exclusion, too, is to eliminate "paper losses" where there can be discrepancy in inventory at a storage location over a extended periods of time. In you reservation of rights letter, you state your belief that the loss was a direct result of theft during the course of transit.

Accordingly, we do not believe the loss is excluded within the intent of this exclusion.

3) Your letter discusses the possibility of the operation of two other exclusions, namely J and M.
   a. J is a common infidelity exclusion and as it specifically excepts carriers for hire from its application, we don't believe it is operative in this instance.
   b. The file documents the due diligence in which the assured engaged when vetting the carrier. We do not see negligence on their part.

The surveyor's comments as his investigation progresses further serves to substantiate the claim. It is clear that all evidence points to the carrier being directly responsible for the theft, and the events are quite consistent with the pattern which law enforcement the Southwest described in detail to the investigator.

For all of these reasons, we believe that there is clear evidence that the claim is not simply the product of a short shipment but in fact is the result of a theft in transit of the cargo. In addition to covering any liability directly imposed on the assured for loss or damage, one of the primary coverages provided by the policy under which this claim is being made is for exactly this type of situation -- a carrier having a liability for loss or damage and not being able or willing to settle to the property owner.

Accordingly, we ask for your prompt re-evaluation of the file and look forward to your favorable response.

*George M. Moreland III*

George M. Moreland III
Senior Vice President
USI of Tennessee, Inc.

Cc: Andy Long
    Jonathan Ward

04/10/2009 11:08 AM 95613_50647



# CENTURY

### Insurance Group
Century Surety Company | ProCentury Insurance Company

Neil Singh
Litigation Counsel
(602) 445-5936 | nsingh@centurysurety.com
(800) 827-6661

February 25, 2009

George M. Moreland III
USI of Tennessee, Inc.
5100 Poplar Avenue, Suite 1200
Memphis, TN 38137

Re:   Claim No.:        01-056676
      Policy No.:       CCP469452
      Insured:          Cornerstone Systems, Inc.

Dear Mr. Moreland:

Century Surety Company is in receipt of your letter regarding the above-referenced matter, which I have reviewed. Your letter is not dated but we received it on February 18, 2009. This letter supplements, and does not substitute for, Century's previous letter submitted to Cornerstone Systems on November 7, 2008.

Century respectfully affirms its previous statement to Cornerstone that there is no coverage at the present time. The assertions contained in your correspondence do not include facts or other information that would alter the coverage analysis.

If there is additional information regarding this claim that may bear on the question of coverage, please provide it to Century for consideration. If any legal action is taken against your client, please notify Century so it can evaluate whether it owes the insured a duty to defend against such action. With this letter, Century does not waive its right to disclaim coverage for any other valid reason which may arise. Century also reserves the right to modify its coverage position based on the receipt of new information.

Please contact me should you have any questions.

Very truly yours,

CENTURY SURETY COMPANY

Neil Singh
Litigation Counsel

NS/mk

cc:   Cornerstone Systems, Inc.
      5101 Wheelis Dr., Suite 300
      Memphis, TN 38117



EXHIBIT
I

04/10/2009 11:08 AM 95613_50647

## HUFFMAN, USEM, SABOE, CRAWFORD & GREENBERG, P.A.

Attorneys At Law

Bruce N. Crawford*
James Olav Saboe
Ronald H. Usem**

1000 Water Park Place
5101 Olson Memorial Highway
Minneapolis, Minnesota 55422
Telephone: 763-545-2720
Facsimile: 763-545-2350
Web: www.huscglaw.com

Richard W. Huffman*
Craig D. Greenberg

March 3, 2009

VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED

Century Insurance Group
Attn: James R. Ohifest, Claims Rep.
P.O. Box 163340
Columbus, OH 43216-3340

RE:  Claim No.:  01-056676
     Policy No.:  CCP469452
     Insured:  Cornerstone Systems, Inc.
     Date of Loss:  April 16-18, 2008
     Type of Loss:  Theft

Dear Mr. Ohifest:

Please be advised that I represent Cornerstone Systems, Inc. of Memphis, Tennessee with respect to the above-entitled matter.

This claim was tendered to you initially on or about July 16, 2008. You already have in your possession the investigative report of MRC Investigations, which states that there is no doubt that the ten pallets of tequila were stolen.

As you also know, Connecticut Distributors was the owner of the shipment and incurred a loss of $100,478. Connecticut Distributors asserted a claim against Cornerstone for that amount, and as you also know, Cornerstone paid it on or about July 28, 2008, and obtained an Assignment of Connecticut Distributors' rights.

Since Century has denied the claim by its letter of November 7, 2008, I will address your assertions that various exclusions preclude payment of this claim.

A.    **With respect to your assertion that Exclusion K applies:**

1.    "Liability for loss or damage arising from pilferage from shipper's load and count containers and/or conveyances unless original seal shows evidence of tampering." Your reliance on Exclusion K is misplaced. The "savings" clause relating to the evidence of seal tampering is irrelevant because evidence shows the shipment was not transported "shipper load and count". The phrase "shipper load and count" does not appear on the bill of lading, nor do the letters "SL&C", per standard in the industry. Additionally, there is no evidence of "pilferage". Your policy of insurance provides no definition of the term "pilferage", and without a definition in the policy, is subject to normal interpretation and construction. Pilferage is defined by Webster's Dictionary as, "*to steal in*

*Admitted To Practice In California; International Association Of Practicing Lawyers
**Transportation Lawyers Association; Transportation Intermediaries Association
*Real Property Law Specialist. Certified By The Minnesota Bar Association

EXHIBIT
F

Century Insurance
March 3, 2009
Page 2

*small quantities, or articles of small value; to practice petty theft.*" (Dictionary.com, "pilfer," in Webster's Revised Unabridged Dictionary. Source location: MICRA, Inc., http://dictionary. reference.com/browse/pilfer. Available: http://dictionary.reference.com. Accessed: February 16, 2009.) The MRC Investigative Report shows no evidence of pilferage. The loss in our case is not small. I do not believe $100,000 loss constitutes "petty theft". The "pilferage" definition does not match the facts of our case. Exclusion K relates only to pilferage "from shipper's load and count container and/or conveyances, unless original seal shows evidence of tampering." Under law applicable to "shipper load and count", the carrier is not responsible for damage resulting from improper loading or any discrepancy in count or concealed damage to articles. Since the bill of lading was not marked "SL&C", the carrier remains liable for the loss.

    2.    The second phrase of the exclusion, "unless original seal shows evidence of tampering," eliminates the effect of the exclusion if the seal is broken. There is no evidence of tampering or breaking of the seal except by law enforcement personnel. Thus, the exclusion is not eliminated by operation of this phrase. It is eliminated as described above.

    3.    Your strained interpretation of Exclusion K would make all theft "pilferage" and thus excluded. Furthermore, your undefined interpretation of "pilferage" makes the exclusion ambiguous, and subject to multiple interpretations. As I am sure you know, as a matter of law, ambiguities are construed against the insurer.

**B.**     **With respect to your assertion that Exclusion L applies:**

    1.    The MRC Investigative Report clearly shows the products were stolen (theft) and your letter of denial acknowledges theft repeatedly. Your assertions that the loss was "unexplained", subject to "mysterious disappearance", or "was shortage on taking inventory" are unfounded. In fact, the MRC report explains the loss in considerable detail. Additionally, there was nothing mysterious about the loss. Case law relating to this exclusion is enlightening. In a case dealing with the interpretation of the meaning of "mysterious disappearance", a Michigan court held that circumstantial evidence may persuade a trier of fact to conclude that theft was more probable than any other theory. If there is evidence pointing to a theory of causation showing a legal consequence of cause and effect, it does not matter if evidence supports other plausible theories. A jury may reasonably infer, based on the evidence presented, that theft is more probable than any other theory of loss. Once this evidence is provided, the burden shifts to the insurance company to prove the "mysterious disappearance" exclusionary clause precludes recovery. Gibralter Plastics, Inc. v. Chubb Group of Insurance, 502 N.W.2d 742 (Mich. App. 1993). According to the Gibralter court, the term "mysterious disappearance" means "unknown, puzzling, baffling, under circumstances which arouse wonder, curiosity or speculation, or under circumstances which are difficult to explain." Under the facts in the instant case, the investigation of MRC leaves no speculation to be made. The shipment was stolen. This loss was not "unexplained", nor was it "mysterious". Gifford v. M. F. A. Mut. Ins. Co., 437 S.W.2d 714, 716 (Mo. Ct. App. 1969)

    2.    Farmland Industrial v. Nat'l Union Fire Ins. Co., 333 F. Supp. 2d 1133, 1142 (D. Kan. 2004). The Insurers argue that Farmland "can furnish no explanation whatsoever" for its loss. Farmland, however, has suggested a reason for its loss. Mr. Schuck testified that his record review

04/10/2009 11:08 AM 95613_50647

Century Insurance
March 3, 2009
Page 3

led him to conclude that Manchester, MEC or Anadarko took Farmland's 500,000 MMBtu of natural gas. According to the court, **theft is not a mysterious disappearance**. Farmland need not prove who is responsible for the theft to overcome the Policy exclusion; it is the Insurer's burden to prove that the Policy exclusion is applicable. See Van Dutch Prods. Corp v. Zurich Ins. Co., 67 A.D.2d 844, 413 N.Y.S.2d 8, 9 (N.Y. App. 1979) (**a loss is not unexplained or mysterious where there is evidence of theft**). Farmland has presented facts to suggest that something other than a mysterious disappearance accounts for its lost natural gas, and summary judgment on this exclusion is therefore inappropriate. Balogh v. Jewelers Mut. Ins. Co., 167 F. Supp. 763, 770 (S. D. Fla. 1958) (insurer failed to establish that mysterious disappearance exclusion was met in view of evidence tending to show that the loss was caused by theft); Stella Jewelry Mfg., Inc. v. Naviga Belgamar Through Penem Int'l Inc.,885 F. Supp. 84, 85-86 (S.D.N.Y. 1995) (same); Betty v. Liverpool & London & Globe Ins. Co., 310 F.2d 308, 310-11 (4th Cir. 1962) (An all risk policy exclusion for unexplained losses or mysterious disappearances of property did not shift the burden of proving that loss fell within exclusion from the insurer to the insured); Sphere Drake Ins. PLC v. Trisko, 24 F. Supp. 2d 985, 997 (D. Minn. 1998) ("Plaintiffs have offered an explanation, supported by circumstantial evidence from several sources, which if believed by the trier of fact could reasonably support an inference of theft. . . . Defendant has failed to show that this version of events is so illogical, implausible or speculative as to warrant summary judgment for the insurer. . . . We conclude that Summary Judgment is not warranted, for either party, on the basis of the "unexplained loss" or "mysterious disappearance" exclusion.")

    3.   Shortage Upon Taking Inventory: Century's primary argument for Exclusion L's application is "Because the shortage was discovered when the DPS officer compared the amount of tequila on the truck to the amount on the bill of lading, the shortage was discovered upon the taking of an inventory."

    4.   CTSC Boston, Inc. v. Continental Insurance, 2001 U.S. App. Lexis 27313. This case provides some understanding of the term "shortage upon taking inventory" referred to in Exclusion L. In the CTSC Boston case, a claim was made for missing computers where the exclusion in a policy provided that "we will not pay for loss of or damage to property that is missing, but there is no physical evidence to show what happened to it, such as shortage disclosed on taking inventory." Under the facts of CTSC Boston, the plaintiff discovered the shortage of computers only when attempting to determine how many more computers it needed for its business. It was apparent from the evidence that plaintiff's poor inventory control resulted in unaccounted for shortages of the laptop computers. The evidence indicated that plaintiffs had no idea when the computers were allegedly stolen, over what period of time, or for that matter whether they were stolen at all. According to the court, this is precisely the scenario excluded by the policy, "Failure to account for and secure one's assets."

    5.   As pointed out in cases, "inventory" means '[a] detailed itemized record of things in one's view or possession, esp. a periodic survey of all goods and materials in stock.' " Farmland Industrial, supra.

Century Insurance
March 3, 2009
Page 4

Century's argument that the police's routine stopping and checking the cargo against the bill of lading constitutes the type of "inventory" checks excluded by this policy begs the question of how any discovery of theft could not be an "inventory" shortage. Such an interpretation is both strained, unconscionable, and not supported by law.

7.    Nat'l Am. Ins. Co. v. Columbia Packing Co., 2003 U.S. Dist. LEXIS 5696, 17-20 (N.D. Tex. Apr. 7, 2003), denied an insurance company summary judgment motion on the grounds that the "Inventory Limitation does not exclude coverage under the policy because there is sufficient physical evidence, other than "a shortage disclosed on taking inventory," to show what happened to the missing property." This analysis is similar to the analysis the courts take regarding "unexplained loss" and "mysterious disappearance" as discussed earlier. The following excerpt from Nat'l Am. Ins. Co., supra, is instructive.

"NAIC and CPC also seek summary judgment with respect to the Inventory Limitation. This policy provision excepts coverage for loss or damage to: Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property. NAIC argues that this limitation applies because the loss suffered by CPC can only be established by inventory methods and documentation. CPC counters that there is adequate physical evidence to show that the loss resulted from theft.

Both parties rely on Betco Scaffolds Co., Inc. v. Houston United Casualty Insurance Co., 29 S.W.3d 341 (Tex. App.--Houston [14th Dist.] 2000, no pet.) (en banc), to support their respective arguments. In Betco, the insured filed a claim with its insurance company for losses resulting from two burglaries. The insured promptly reported the burglaries to the police, but did not file an insurance claim until further shortages were discovered following an annual inventory.

The insurance company denied the claim based, in part, on a policy provision that excluded coverage for "loss or shortage disclosed upon taking inventory[.]" Thereafter, the insured filed suit in state district court for breach of contract, breach of the duty of good faith and fair dealing, and violations of the Texas Insurance Code. The trial court granted summary judgment in favor of the insurance company as to all claims and causes of action. A divided court of appeals affirmed. In reaching its decision, the majority first discussed the intent and plain meaning of the inventory limitation: We believe that the inventory exclusion provision reflects a recognition of the inherent uncertainty as to the causes of shortages which are only disclosed upon taking a periodic physical inventory. We further believe that the inventory exclusion provision (like a proof of loss provision) reflects a recognition that an insurer should be afforded a fair opportunity to: (I) investigate the circumstances of a claim before circumstances change and memories fade, and (ii) where, as here, a theft is alleged, attempt recovery of the stolen items...." Significantly, the insured presented no evidence to the insurance company or to the court establishing that the missing property was taken in the burglaries. The only evidence was the results of its annual inventory. Id. Based on these facts, the appellate court held that the inventory limitation excluded coverage.

Century Insurance
March 3, 2009
Page 5

The dissent, relying on authorities from other jurisdictions, found that the phrase "disclosed upon taking inventory" was ambiguous or, at the very least, raised a fact issue as to whether the loss in that case was disclosed, rather than quantified, by the inventory. Betco, 29 S.W.2d at 350 (Murphy, C.J., dissenting).

Unlike Betco, CPC does not rely solely on its inventory to establish its loss. The summary judgment evidence includes a judicial confession and the sworn testimony of William Mahoney admitting that he stole approximately $200,000 worth of meat from CPC between December 1999 and May 2000. Moreover, NAIC has acknowledged that CPC "sustained losses in excess of $ 200,000.00, as evidenced by its inventory procedures and that such losses occurred as a result of theft." The mere fact that this loss may have been quantified through routine inventory procedures does not preclude coverage. Even the Betco majority recognized that: regularly scheduled inventory could coincide with the investigation of a casualty in such a way that the inventory is intended by the insured as a means to quantify the loss. In that event, the inventory exclusion provision would not exclude the loss because the loss would not have been disclosed upon taking inventory. Betco, 29 S.W.3d at 347 (emphasis in original).

The court concludes as a matter of law that the Inventory Limitation does not exclude coverage under the policy because there is sufficient physical evidence, other than "a shortage disclosed on taking inventory," to show what happened to the missing property. CPC's motion for summary judgment is granted and NAIC's motion for summary judgment is denied on this ground."

In summary, based on the facts of the MRC Report and applicable case law, Exclusion K does not apply.

C.   **Exclusion J**: Your assertion that Exclusion J applies, i.e. dishonesty of the insured, is totally without merit, unsupported by any facts, is less than genuine, and unconscionable. Cornerstone, as a broker, never had physical possession of the freight. There is absolutely not one shred of evidence of any dishonest act on the part of Cornerstone.

D.   **Exclusion M**:

    1.    Your assertion that Exclusion M may apply stretches the boundaries of credulity and common sense to understand how the exclusion could apply when the evidence is clear that theft has occurred. In this instance, there was nothing to "preserve". A partial portion of the shipment was stolen and was never recovered. The remaining portion of the shipment was delivered to the consignee without incident. It has been nearly one whole year since the date of loss and to the best of our knowledge, Century has not conducted its own investigation, but rather has relied solely on the investigation conducted by MRC. When Cornerstone asked for a copy of the MRC investigative report, it was refused. Only after insistence by Cornerstone over several months was it finally delivered. It is far less than genuine that you could ask for continued cooperation from Cornerstone, when your own actions are quite to the contrary.

04/10/2009 11:08 AM 95613_50647

Century Insurance
March 3, 2009
Page 6

    2.    As you already know, Cornerstone's customer, Connecticut Distributors, has been paid for this loss, and Cornerstone is out of pocket $100,000. <u>The policy was represented by your agent to Cornerstone to cover theft</u>. Cornerstone was entitled to rely on the representations of your agent and did reasonably rely on them. As a direct result of their reasonable reliance, they have now sustained damages of $100,000. Denial of coverage constitutes breach of contract, and possibly fraud, in the inception, as well as deceptive trade practices. While your letter of denial focuses solely on exclusions, you completely neglect that the contract obligates your company to cover losses, which in this instance are described under Pars. A, B and D.

    Par. A covers 100% interest of all shipments for physical loss to the property for which the insured, Cornerstone, has been held liable. Cornerstone has been held liable by its customer, and has paid. The policy obligations for payment have been triggered.

    Under Par. B, the parties responsible for the loss, namely the motor carrier and/or Patron Spirits, have provided no payment for nearly one year. Thus, there has been no settlement within a reasonable period of time after presentation of the proof of loss.

    Par. D applies because Cornerstone has been held liable by Connecticut Distributors. It was a contingent liability occasioned by fraud or deceit on the part of Patron Spirits and/or Dolle Motor Carriers.

    In summary, for the reasons stated above, demand for payment of $100,000 to reimburse Cornerstone for its loss is made upon you. Failure to receive payment, or agreement to pay by **March 13, 2009**, appropriate legal action will be taken to protect their interests. If you wish to discuss this please feel free to contact me.

Yours very truly,

Ronald H. Usem
RHU/kjd

cc:    Jon Ward, Cornerstone Systems
       Tim Clay, Cornerstone Systems
       Andy Long, Cornerstone Systems

Page 1 of 1

### Main Identity from Ron

From:       "James R. Ohlfest" <JOhlfest@centurysurety.com>
To:         <ron@usems.com>
Sent:       Wednesday, March 18, 2009 1:38 PM
Subject:    FW: 01-56676 Cornerstone Systems, Inc.

From:       James R. Ohlfest
Sent:       Wednesday, March 18, 2009 11:22 AM
To:         'ron@usemens.com'
Cc:         Neil Singh
Subject:    01-56676 Cornerstone Systems, Inc.

Mr. Usem,

Thank You for speaking with me Monday, 3/16/09, relative to your letter of 3/3/09.

Again, I apologize for not responding earlier but, as I related, I was out of the office on business last week and did not see the document prior to 3/16/09.

I have had an opportunity to discuss your letter with house counsel. We have agreed that it needs to be examined by outside coverage counsel to reflect on your points of dispute as to our coverage declination. Once we have been able to acquire an analysis of the merits of the Insured's contentions, I will communicate with you further,

Unfortunately, I can not guarantee I will be able to be get back to you prior to any regulatory timelines April 16, 2009 may represent. If you find preparing a lawsuit against our company is necessary, I would appreciate your forwarding a courtesy copy to me.

Sincerely,

James R. Ohlfest

Century Surety Company/ProCentury Ins Co.
4722 N. 24th Street, Suite 200
Phoenix, Az. 85016
Phone: 602-216-6566 or 800-854-8045
Fax: 602-371-0113
johlfest@centurysurety.com

No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 8.0.238 / Virus Database: 270.11.18/2009 - Release Date: 03/18/09 07:17:00



3/18/2009

04/10/2009 11:08 AM 95613_50647

**(CHANCERY/CIRCUIT) COURT OF TENNESSEE** 01-58744NS
140 ADAMS AVENUE   MEMPHIS, TENNESSEE 38103
FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

*Plead Compl*

**SUMMONS IN CIVIL ACTION**

NO. _____   AD DAMNUM   $ _____   AUTO ☐ OTHER ☐

Cornerstone Systems, Inc.

**FILED**
APR 0 3 2009

Home Address
5101 Wheelis Drive, Ste 300, Memphis TN 38117

vs.        **PLAINTIFF**        Business Address

**RECEIVED**

Century Surety Company

**APR 1 0 2009**

BY _____
Home Address

**SCANNING DEPT** 465 Cleveland Avenue, Westerville, OH 43082

**DEFENDANT**                    Business Address

TO THE DEFENDANT(S): Century Surety Company, through its registered agent, Nicholas Z. Alexander, 465 Cleveland Avenue, Westerville, Ohio 43082. Serve through Secretary of State

You are hereby summoned and required to defend a civil action by filing your answer with the Clerk of the Court and serving a copy of your answer to the Complaint on _____ Mark S. Norris and Tricia T. Olson _____ Plaintiff's attorney, whose address is ____ 80 Monroe Ave., Ste 700, Memphis, TN 38103 ____ , telephone ____ 901-525-3234 ____ within THIRTY (30 ) DAYS after this summons has been served upon you, not including the day of service.  If you fail to do so, a judgment by default may be taken against you for the relief demanded in the Complaint.

JIMMY MOORE, Clerk
KENNY ARMSTRONG, Clerk & Master

TESTED AND ISSUED _____ , 20____      By _____ , D.C.

TO THE DEFENDANT(S):

NOTICE: Pursuant to Chapter 919 of the Public Acts of 1980, you are hereby given the following notice: Tennessee law provides a four thousand dollar ($4,000) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the Clerk of the Court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed. These include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible and school books. Should any of these items be seized, you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

**COST BOND**

I hereby acknowledge and bind myself for the prosecution of this action and payment of all costs not to exceed $500.00 m this court which may at any time be adjudged against the plaintiff in the event said plaintiff shall not pay the same.

Witness My Hand this _____ day of _____ ,20 ____

Certification when applicable

_____
Surety

I, KENNY ARMSTRONG, Clerk & Master of the Chancery Court, Shelby County, Tennessee, certify this to be a true and accurate copy as filed this _____
KENNY ARMSTRONG, Clerk & Master

By: _____ , D.C.

I, JIMMY MOORE, Clerk of the Circuit Court, Shelby County, Tennessee, certify this to be a true and accurate copy as filed this _____
JIMMY MOORE, Clerk

By: _____ , D.C.

Front

04/10/2009 11:08 AM 95613_50647

# RETURN ON SERVICE OF SUMMONS

I HEREBY CERTIFY THAT I HAVE SERVED THE WITHIN SUMMONS:

By delivering on the _____ day of _____, 20 ___ at _____ M.

a copy of the summons and a copy of the Complaint to the following defendents

_____

Mark Luttrell, Sheriff

By _____

Deputy Sheriff

## PRIVATE PROCESS SERVER

I HEREBY CERTIFY THAT I HAVE SERVED THE WITHIN SUMMONS:

By delivering on the _____ day of _____, 20 ___ at _____ M. a copy of the

summons and a copy of the Complaint to the following defendants

_____

### (PLEASE PRINT THE FOLLOWING)

_____

Private Process Server

_____

Company

Other manner of service:

_____

_____

_____

Address

_____

Phone

_____

Signature

I hereby certify that I have NOT served this Summons on the within named defendant(s) _____

_____

because _____ is / are not to be found in this County for the

following reason(s): _____

_____

Mark Luttrell, Sheriff

This _____ day of _____, 20 ___.   By _____

Deputy Sheriff

NO. _____   D. _____

IN THE
(CHANCERY/CIRCUIT)
COURT
OF TENNESSEE
FOR THE THIRTIETH
JUDICIAL DISTRICT AT MEMPHIS

SUMMONS IN CIVIL ACTIONS

PLAINTIFF

VS.

DEFENDANT

Came to hand _____

Attorney for Plaintiff _____

Tel. No. _____

Back

04/10/2009 11:06 AM 95613_5064



# ADAMS AND REESE LLP
®

**Attorneys at Law**
Baton Rouge
Birmingham
Houston
Jackson
**Memphis**
Mobile
Nashville
New Orleans
Washington, DC

**Tricia T. Olson**
Direct (901) 524-5284
E-Fax (901) 524-5384
tricia.olson@arlaw.com

April 6, 2009

*VIA CERTIFIED MAIL*
*RETURN RECEIPT REQUESTED*

Nicholas Z. Alexander
Century Surety Company
465 Cleveland Avenue
Westerville, OH 43082

      *Re:*    *Cornerstone Systems, Inc. v. Century Surety Company*

Dear Mr. Alexander:

    Enclosed herein please find a copy of the Summons and Complaint that were filed in regards to the above-referenced matter.

    If you have any questions, please feel free to contact me.

                    Sincerely,

                    Tricia T. Olson

TTO/rmc
Enclosures